**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TERA II, LLC,** *et al.*. | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:19-cv-2221** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **RICE DRILLING D, LLC,** *et al.*, | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter comes before this Court on Plaintiffs' Motions for Partial Summary Judgment (ECF Nos. 145; 386) and Defendants' Motions for Summary Judgment (ECF Nos. 387; 388; 389; 393; 394; 477). Former Defendants XTO Energy, Inc. and Phillips Exploration LLC's Motion for Summary Judgment (ECF No. 392) is **DENIED AS MOOT** because they have been dismissed with prejudice. (ECF No. 417). For the reasons set forth *infra*, this Court rules as follows:

- **Threshold Matters:**
  - Plaintiffs' First Motion for Partial Summary Judgment is **NOT** moot; Defendants' Motion is **DENIED**.
  - Plaintiffs' Motion to use offensive non-mutual collateral estoppel is **DENIED**.
  - Defendant Ascent Resources – Utica, LLC's ("Ascent") Motion on application of Joint Venture Theory of Liability:
    - **GRANTED** for Ascent, **DENIED** for Plaintiffs: Gold Digger, Son-Uva, Big Foot 7, Dorsey East, Skyhawk 3 Units.
    - **DENIED** for Ascent, **GRANTED** for Plaintiffs: Gold Digger South 3 and South 4 Units.
    - **DENIED** for both Ascent and Plaintiffs: Snodgrass Unit.
    - Potential period of liability under Joint Venture Theory: **DENIED** for both parties.
  - Defendant Gulfport Energy Corporation and Gulfport Appalachia, LLC's (together "Gulfport") Motion for Summary Judgment for all damages prior to May 17, 2021 is **GRANTED**.
- **COUNT I –** Declaratory Judgment: **DENIED** for all parties.
- **COUNT II –** Trespass: **GRANTED in part, DENIED in part** for Defendants; **DENIED** for Plaintiffs.

- **COUNTS III & IV** – Conversion & Unjust Enrichment: **DENIED** for Plaintiffs; **GRANTED in part** for Defendants as related to application of the rule of capture and **DENIED in part** for remainder of argument for Defendants.
- **COUNT V** – Fees: Defendant's Motion for Summary Judgment is **DENIED**.
- **COUNT VI** – Breach of Contract: Plaintiffs' Motion is **DENIED**; Defendants Rice Drilling D, LLC's ("Rice") Motion is **GRANTED**; Defendant Gulfport's Motion is **GRANTED in part** and **DENIED in part**.
- **Affirmative defenses:** Plaintiffs' Motion is **DENIED** as to all affirmative defenses.

## I.     BACKGROUND

### A. Factual Background

Plaintiffs TERA II, LLC ("TERA II"), TERA III Honza, LLC ("TERA III"), TERA IV, LLC ("TERA IV"), Thomas and Jeannine Shaw, Joyce Chambers, and Donald Scott Harvey own oil and gas rights in Belmont County, Ohio. (ECF No. 302; ¶¶ 1–7, 41). On December 31, 2013, Defendant Rice leased Plaintiffs' property for the development of oil and gas. (*Id.*; ¶¶ 32–40). Rice assigned its leases with TERA II to Defendant Ascent, who in turn assigned a partial interest to Defendant Gulfport Energy. (ECF No. 64 at 1–2). Rice allowed Gulfport and Ascent to drill horizontal wells on TERA II, TERA III, and TERA IV's properties, and entered into an agreement with Gulfport to develop Plaintiff Thomas Shaw and Joyce Chambers' property. (ECF Nos. 64 at 1 – 2; 302, ¶ 45). Defendants own interests in the respective wells and benefit from the sale of any oil, gas, and other hydrocarbons produced from these wells. (ECF No. 64 at 2).

Plaintiffs' property is spread across ten pooled units. Under Ohio law, landowners can pool together adjoining properties to form a single drilling unit, and all production of oil and gas from anywhere in the unit is considered produced from the unit as a whole no matter where the well was drilled. *See* OHIO REV. CODE §§ 1509.26–.27. Defendants allocate royalties from the sale of oil and gas from any well drilled in that pooled unit based on the percentage of total acreage a landowner holds in the pooled unit. *J&R Passmore, LLC*, No. 2:18-cv-1587, 2023 WL 2667749, at *3 (S.D. Ohio Mar. 28, 2023).

2

Ascent argues that their involvement in this case is limited, because they only have a working interest in one of the Shaw/Harvey leases that covers less than 8.5 acres and contains two parcels of land, both of which have been included in the Coleman RCH BL and Ross SE RCH BL Units—Ascent-operated pools. (ECF No. 388 at 5). Ascent represents that the three wellbores in the Coleman Unit do not traverse the Shaw/Harvey property and only one wellbore in the Ross Unit may traverse the property. (*Id.*). As demonstrated more fully below, however, Ascent did have interests in other units while wells in those units were drilled and/or production was ongoing.

Plaintiffs allege that Rice, Gulfport, and Ascent have infringed on Plaintiffs' mineral rights by drilling on property that they are not entitled to drill, outside of the terms of the leases. (ECF No. 64 at 3). The Granting Clause states:

> Lessor . . . leases and lets exclusively to the Lessee all the oil, gas, minerals and their constituents (not including coal) in the formations commonly known as the Marcellus Shale and the Utica Shale.

(ECF No. 302; ¶ 50). The Reservation Clause states:

> Lessor specifically reserves the rights to all products contained in any formation . . . and (3) in all formations below the base of the Utica Shale.

(*Id.*; ¶ 51). Plaintiffs allege that Defendants are permitted only to drill the Marcellus and Utica Shale formations, and that Defendants have gone beyond the terms of the leases by drilling into and producing from the Point Pleasant formation below the Utica Shale. (ECF No. 64 at 3). While Defendants agree that the Utica Shale and Point Pleasant formations are distinct geologically, they argue that the Utica Shale is commonly understood in the oil and gas industry to include the Point Pleasant; therefore, they have a right to drill there. (ECF No. 407 at 4).

Of note, Rice began leasing oil and gas interests in Belmont County in 2010 as part of a separate negotiation with the Smith-Goshen Group, a group of Belmont County landowners represented by Larry Cain. (ECF No. 389 at 13). Both Larry Cain and Toby Rice, then-COO of

Rice and current CEO of EQT (Rice's parent company), have testified in deposition that when they negotiated the Smith-Goshen leases with the at-issue Reservation Clause, they intended the Point Pleasant to be included in the term "commonly known as the Utica Shale." (*Id.* at 14). While the Plaintiffs in this case allege that they were not members of the Smith-Goshen Group, they attended meetings with the Smith-Goshen Group and did not change the pertinent Reservation Clause language used in the Cain and Rice negotiations when drafting their own leases. (*Id.* at 16).

Plaintiffs bring six causes of action: (1) a declaratory judgment that the Utica Shale and Point Pleasant formations are distinct, and that Defendants do not have a right to produce from below the Utica Shale; (2) willful trespass;[1] (3) conversion; (4) unjust enrichment; (5) all litigation fees; and in the alternative (6) breach of contract against Rice and Gulfport for underpayment of royalties. (ECF No. 302, ¶¶ 105–55).

## B. Procedural Background

On April 25, 2019, Plaintiffs filed suit in the Belmont County Court of Common Pleas seeking a declaratory judgment regarding their rights under the leases and alleging trespass, conversion, and unjust enrichment. (ECF No. 64 at 3). On May 28, 2019, Rice timely removed this action to this Court. (ECF No. 1). The parties proceeded through motions to dismiss and discovery, and one Plaintiff and two defendants were dismissed. On July 28, 2020, this Court

---

[1] Plaintiffs allege the following were properties trespassed upon: (1) **Dorsey East Unit:** Dorsey 1B well: Plots 24 and 25, owned by TERA II, Dorsey 1B well: Plot 46, owned by Thomas Shaw and Joyce Chambers; (2) **Snodgrass West Unit:** Snodgrass 3A well: Plots 10 and 11, owned by TERA III; (3) **Skyhawk Unit:** Skyhawk 12 well: Plot 21, owned by TERA III: (4) **Gold Digger Unit**: Gold Digger 1H well: Plots 10 and 11, owned by TERA IV; (5) **Son-Uva Digger Unit**: Son-Uva Digger 1H well: Plot 82, owned by TERA IV, Son-Uva Digger 3H: Plot 83, owned by TERA IV, and Son-Uva Digger 5H-A: Plots 83 and 85, owned by TERA IV; (6) **Gold Digger South 3 Unit:** Gold Digger South 3 6H well: Plot 2, owned by TERA IV: (7) **Gold Digger South 4 Unit:** Gold Digger South 4 8H well: Plot 1, owned by TERA IV; (8) **Bigfoot 7 Unit:** Bigfoot 7 10 well: Plot 5, owned by TERA IV; and (9) **Ross SE RCH BL Unit:** Ross SE RCH BL 11H well: Plot 9, owned by TERA IV. (ECF Nos. 418 at 37–38; 386-2).

granted Plaintiffs leave to amend their complaint to add an alternative claim for breach of contract (Count VI) against Rice and Gulfport. (ECF No. 153). On July 1, 2021, Gulfport Appalachia, LLC (hereinafter Gulfport Energy Corporation and Gulfport Appalachia, LLC are "Gulfport") was added as a Defendant, resulting in the current composition of the parties. (ECF No. 243).

Plaintiffs filed two Motions for Partial Summary Judgment on Counts I–IV and VI. (ECF Nos. 145; 386). Defendants filed several Motions for Summary Judgment. (ECF Nos. 387; 388; 389; 393; 394; 477). The parties timely responded and replied. Oral argument on the motions was held, and this matter is now ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). This Court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. And "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," but evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

5

The party seeking summary judgment carries the initial burden of presenting this Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see Anderson,* 477 U.S. at 250.

This Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). The Court applies the same standard of review when the parties file cross-motions for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). Thus, in reviewing cross-motions for summary judgment, a court must still "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

### III.    LAW & ANALYSIS

#### A. Threshold Matters

##### *1.  Plaintiffs' First Motion for Partial Summary Judgment is Not Moot*

Defendants argue that the filing of both the First Amended Complaint (ECF No. 154) and the Second Amended Complaint (ECF No. 302) after Plaintiffs filed their first Partial Motion for Summary Judgment (ECF No. 145), makes the motion moot. (ECF No. 407 at 3). Plaintiff

responds that this Court set the briefing of Plaintiffs' first Motion for Summary Judgment such that it would occur after discovery was completed (ECF No. 152). (ECF No. 418 at 33). Therefore, Plaintiffs argue that they complied with this Court's orders and properly incorporated the Motion into the subsequent filings. (ECF No. 386). (*Id.*).

First, this Court extended Defendants' response deadline to Plaintiffs' first Partial Motion for Summary Judgment to twenty-one days after the close of discovery. (ECF No. 152). Given that discovery was in progress, this Court found that Plaintiffs' Motion was premature and granted Defendants' request for additional time to respond. *See Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) (explaining that district courts have inherent authority to manage their dockets). The briefing schedule was not altered after Plaintiffs filed the subsequent amended complaints.

Second, subsequent filings of amended complaints do not necessarily moot prior motions for summary judgment where the claims remained substantively the same, unless the motion pertained to claims that were removed in the Amended Complaint. *McCall v. FedEx Corp.*, No. 2:17-CV-381, 2018 WL 1565607, at *2 (S.D. Ohio Mar. 30, 2018); *see also Enyart v. Karnes*, No. 2:09-cv-687, 2010 WL 4823061, at *2 n. 5 (S.D. Ohio Nov. 12, 2010) (King, M.J.) ("Because plaintiff's anticipated amended complaint only adds new parties that do not change the substantive allegations against defendant . . ., the anticipated amended complaint will not moot defendant['s] pending motion for summary judgment."). Plaintiffs' First Amended Complaint added the claim for breach of contract related to royalties. (ECF No. 154). The Second Amended Complaint, however, did not modify the Declaratory Judgment claim, Count I, but did modify the Trespass claim, Count II. (ECF No. 302). A review of Count II in the amended Complaints demonstrates that the actual allegations remained the same; Plaintiffs sought only to identify four additional wells which were drilled after the original complaint was filed. (ECF No. 301).

Even though the amended complaints added new claims, the First Motion for Partial Summary Judgment only addressed Counts I and II. Because the Complaint, as it relates to the first Motion for Summary Judgment remains substantively the same, this Court will not treat it as moot. As such, Defendants' Motion for Summary Judgment on mooting Plaintiffs' First Motion for Partial Summary Judgment is **DENIED**.

### 2. Companion State Court Case and Collateral Estoppel

Plaintiffs argue that entry of partial summary judgment by the Ohio Court of Appeals in favor of plaintiff TERA, LLC, who is not named in this action, on its declaratory judgment and trespass claims against Gulfport and Rice in a companion state court case is preclusive of Plaintiffs' declaratory judgment and trespass claims here. (ECF Nos. 415 at 15 (citing *Tera, LLC v. Rice Drilling D, LLC*, 2023-Ohio-273, ¶ 1 n. 3, 205 N.E. 3d 1168, 1174 (Ohio Ct. App. Jan. 18, 2023), *reconsideration denied*, 2023-Ohio-427 (Ohio Ct. App. Feb. 7, 2023)). Defendants maintain that Ohio does not recognize offensive collateral estoppel, and the state ruling has no preclusive effect. (*Id.* at 18). Ascent also argues that they were not a party to the state court action nor were they in privity with the defendants named in the state court action. (*Id.* at 16–19).

A district court has "broad discretion to determine" whether to apply collateral estoppel. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). In federal diversity actions, this Court must apply state law to determine whether a prior decision has preclusive effect, but only where the state rule is not "incompatible with federal interests." *Prod. Sols. Int'l, Inc. v. Aldez Containers, LLC*, 46 F.4th 454, 457–58 (6th Cir. 2022) (quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508–09 (2001)). Under Ohio law, courts generally apply collateral estoppel when the issue: "was actually and directly litigated in the prior action" as part of a final judgment, "a court of competent jurisdiction" decided the issue, and "the party against whom collateral estoppel

is asserted was a party in privity with a party to the prior action." *In re: E.I. Dupont de Nemours and Co. C-8 Personal Injury Litigation*, 54 F.4th 912, 921 (6th Cir. 2022) (quoting *State ex rel. Jefferson v. Russo*, 159 Ohio St.3d 280, 150 N.E.3d 873, 875 (2020)). The party against whom estoppel is exercised must have had a "full and fair opportunity" to litigate the issue in the first action. *Walden v. State*, 47 Ohio St.3d 47, 547 N.E.2d 962, 966 (1989) (quoting *Hicks v. De La Cruz*, 52 Ohio St.2d 71, 369 N.E.2d 776, 778 (1977)). The court must assess whether factual differences between the cases "are legally significant—*i.e.*, were crucial to resolving the issues in the compared cases." *In Re E.I. Dupont*, 54 F. 4th at 923.

To clarify this Court's previous ruling denying class certification in *J&R Passmore*, *see* 2023 WL 2667749, Ohio courts generally require mutuality of parties to apply collateral estoppel. A recent ruling by the Sixth Circuit, however, explained that the Ohio Supreme Court recognizes non-mutual offensive collateral estoppel in limited cases requiring "flexibility and exceptions to such rule"—namely  where the defendant "clearly had his day in court on the specific issue brought into litigation within the later proceeding, [then] the non-party plaintiff [can] rely upon the doctrine of collateral estoppel to preclude the relitigation of that specific issue." *In Re E.I. Dupont*, 54 F.4th at 922 (quoting *Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St.3d 193, 443 N.E.2d 978, 987 (1983)). The United States Supreme Court, however, cautions against applying non-mutual offensive collateral estoppel where: (1) it would encourage "a 'wait and see' attitude" among potential plaintiffs hoping "that the first action by another plaintiff will result in a favorable judgment;" (2) the defendant did not have reason to "defend vigorously, particularly if future suits [were] not foreseeable;" (3) where the judgment relied upon as a basis for estoppel is inconsistent with one or more previous judgments that favor the defendant; or (4) the second action gives the

9

"defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane Hosiery Co.*, 439 U.S. at 330–31.

In October 2017, plaintiff TERA, LLC brought a nearly identical action against Rice and Gulfport in Ohio state court. *Tera, LLC*, 2023-Ohio-273, ¶ 1 n. 3. At issue in the state case were Rice and Gulfport's rights under a drilling lease on TERA, LLC's property with the same Reservation Clause language, and whether the lease provided defendants the right to extract oil and gas from the Point Pleasant below TERA, LLC's property. (*Id.*, ¶¶ 8–10). Plaintiff TERA, LLC[2] also brought allegations of breach of contract, intentional subsurface trespass, conversion, and unjust enrichment. *Id.* In 2020, the Court of Common Pleas entered summary judgment in favor of TERA, LLC for bad faith trespass and conversion, reasoning that the lease language unambiguously reserved the subsurface rights in Point Pleasant to the plaintiff. *TERA, LLC*, 2023-Ohio-273, ¶¶ 1–2.

On appeal, the Seventh District Court of Appeals of Ohio upheld the trial court's ruling on contract interpretation, bad faith trespass, and conversion. (*Id.*, ¶¶ 52–53). The court reasoned that the Point Pleasant and Utica Shale had specific, geological definitions, and the trial court had correctly applied the traditional canons of contract interpretation by using the ordinary definitions of those words. (*Id.*, ¶¶ 50–51). The court vacated and remanded the ruling on compensatory damages (*Id.*, ¶ 6) and denied reconsideration. *TERA, LLC*, 2023-Ohio-427, ¶ 3. The defendants Rice and Gulfport in *TERA, LLC* appealed to the Ohio Supreme Court to consider three issues: (1) did the lease convey rights to the Point Pleasant formation to defendants; (2) are the defendants

---

[2] TERA, LLC is one of several TERA entities, some of which are named here, which leased subsurface rights in property located in Belmont County. The members of the other TERA entities are Thomas Shaw and one or more of his three daughters. *Tera, LLC*, 2023-Ohio-273, ¶ 1 n. 2.

bad-faith trespassers; and (3) were bad-faith trespass damages properly calculated. (ECF No. 479-1). The Ohio Supreme Court has accepted jurisdiction of the first two issues. (ECF No. 487).

At first glance, the requirements of non-mutual offensive collateral estoppel appear to be met as it pertains to Rice and Gulfport. These cases, however, present the classic "wait and see" scenario the United States Supreme Court cautioned against. Unlike defensive collateral estoppel which incentivizes a plaintiff to join all potential defendants in the first action and promotes judicial economy, offensive collateral estoppel gives the plaintiff every incentive to "wait and see" if the first action by another plaintiff results in a favorable judgment. *Parklane Hosiery Co.*, 439 U.S. at 330. Therefore "offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action." *Id.* Here, Plaintiffs attempt to stop Defendants from relitigating the issues which defendants previously litigated and lost against another plaintiff. Plaintiffs have given no justification for why they did not join the earlier action, especially because it is this Court's understanding that the TERA entities here are related in membership to TERA, LLC. Their delay is questionable given that Plaintiffs indicate that they became aware of Defendants drilling into the Point Pleasant as early as 2017—the year *TERA, LLC* was filed. (ECF No. 386 at 49 n. 71). Therefore, the application of non-mutual offensive collateral estoppel would be unfair to Defendants as this case does not present the unique circumstances which as contemplated by the Ohio Supreme Court in *Goodson*. This Court **DENIES** Plaintiffs' Motion as it pertains to this issue and the Ohio court decision will not have non-mutual offensive collateral estoppel effect.

### 3. Joint Venture Theory for Ascent

Plaintiffs assert that the Defendants are jointly and severally liable for all damages pursuant to Ohio Revised Code § 2307.22(A)(1), which Plaintiffs allege requires any party with more than 50% working interest in a pooled unit to be held jointly and severally liable in tort. (ECF No. 418 at 43–49). Ascent argues that its direct involvement in this case is limited to its operation of the Coleman and Ross SE Units, and that the remaining claims Plaintiffs bring are related to leases in which Plaintiffs claim Ascent entered joint venture agreements with the other defendants. (ECF Nos. 388 at 27–33; 415 at 24–25; 424 at 24–26, 27–29). Ascent maintains that none of the requirements for the existence of a joint venture is met because it is not party to the operation of these other units and does not share in the revenues produced. (ECF No. 424 at 29).

This Court addressed the issue of Ascent's joint liability at the motion to dismiss stage of this litigation. Then, Ascent and a since dismissed defendant, XTO, argued that they should not be parties to this litigation because they never entered into a joint venture with the other defendants in regard to Plaintiffs' property. (ECF No. 64 at 6–7). Specifically, Ascent argued that "[t]he mere existence of an operating agreement does not establish a joint venture relationship." (ECF No. 45 at 3). This Court rejected that argument, however, because under Ohio law, a joint venture is nothing more than an agreement "'to carry out a common business purpose.'" *Schlaegel v. Howell*, 2015-Ohio-4296, 42 N.E.3d 771, 777 (Ohio Ct. App. 2015) (quoting *Nilavar v. Osborn*, 127 Ohio App. 3d 1, 711 N.E.2d 726, 738 (Ohio Ct. App. 1998)). Therefore, under Ohio law, an operating agreement alone can constitute a joint venture as long as the plaintiffs demonstrate the following:

> (1) there is a joint contract; (2) Defendants intended to form a joint venture; (3) there exists a "community of interest and control, including contributions to the joint venture"; (4) Defendants have "the mutual right to direct and control the purpose of the joint venture"; and (5) Defendants have agreed to share in the profits and the losses.

*Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996). A "contract of joint adventure need not be established by showing an express agreement between the parties, but it may be implied or inferred, in whole or in part, from their acts and conduct." *Bennett v. Sinclair Refining Co.,* 144 Ohio St. 139, 57 N.E.2d 776 (1944), paragraph five of the syllabus. As previously stated, "[u]nder Ohio law, parties who have entered into a joint venture agreement are each 'liable for the negligent and tortious acts of the other members, pursuant to the venture, that result in injury to third persons,'" (*see* ECF No. 64 at 14), and are jointly and severally liable for compensatory damages for intentional tort claims. Ohio Rev. Code § 2307.22(A)(3).

As a general matter, Ascent cannot be held liable under a joint venture theory for any damages that may arise from the Gold Digger,[3] Son Uva Digger,[4] Big Foot 7,[5] and Dorsey East[6] Units because they either never held leases or did not have a working interest in these units, or they assigned those interests to the other Defendants prior to the completion of the drilling of the wells. *See Buckeye Wellness Consultants, LLC v. Hall*, 2022-Ohio-1602, ¶ 16, 2022 WL 1499758, at *3 (Ohio Ct. App. May 12, 2022) *appeal not allowed sub nom Buckeye Wellness Consultants, L.L.C. v. Hall*, 2022-Ohio-3135, ¶ 16, 167 Ohio St. 3d 1512, 194 N.E.3d 380 (reasoning that a contract effective date limited an employee's employment contract to one year). Additionally, while Plaintiffs later allege that Ascent held a working interest in the Skyhawk 3 Unit (ECF No.

---

[3] Ascent executed an agreement in 2015 to assign its interest in the Unit to Rice with an effective date of June 25, 2014, which was prior to the date the wells were drilled. (ECF Nos. 388 at 32; 391-12). The exhibit Ascent cites for this assertion states that the assignment was effective on June 25, 2014. In a separate briefing, however, Ascent states the effective date was July 24, 2015.This date refers only to "[a]ll capitalized terms not defined herein shall have the meaning ascribed to them in that certain Letter Agreement effective July 24, 2015." (ECF No. 391-12). Ascent's subsequent briefings, however, state that it assigned its interests in this Unit on June 25, 2014. (ECF No. 424 at 26). Therefore, this Court understands the assignment to have occurred on June 25, 2014. *Id.*
[4] Ascent assigned its interest in the Unit to Rice with an effective date of June 25, 2014, prior to the first wells being completed. (ECF Nos. 388 at 31; 391-10).
[5] Ascent never held an interest in this pooled unit.
[6] Ascent conveyed its interest in the Dorsey East Unit effective June 1, 2015, but the first wells in this unit were not drilled to completion until October 13, 2016. (ECF Nos. 388 at 29; 145 at 5–7; 145-1).

418 at 38) in their Response and Reply, Plaintiffs fail to plead Ascent's involvement in this Unit in the operative Complaint (ECF No. 302, ¶¶ 73–74). Plaintiffs did not file a motion to amend their complaint and cannot raise a new legal claim for the first time in response to a party's summary judgment motion. *Tucker v. Union Needletrades, Industrial and Textile Employees*, 407 F. 3d 784, 788 (6th Cir. 2005). Therefore, Ascent cannot be held liable for damages for the Gold Digger, Son-Uva Digger, Big Foot 7, Dorsey East, and Skyhawk 3 Unit under a joint venture theory of liability. Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant Ascent's motion is **GRANTED**.

Conversely, because Ascent owns a 100% working interest in the Ross SE RCH BL and Coleman RCH BL[7] Units, it *can* be held liable for these units.

For the remaining three units, this Court must assess whether there exists a genuine dispute of material fact as it pertains to the five-part joint venture test. The evidence presented by Plaintiffs, however, is sufficient to establish that Ascent participated in a joint venture with the other Defendants during the time in which it held leases within the Gold Digger South 3 and 4[8] Units, but there remains a genuine dispute of material fact as to Snodgrass West Unit.[9]

A joint venture is "an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose

---

[7] Ascent alleges that the Shaw/Harvey lease covers less than 8.5 acres and contains two parcels of property that have been included in the Coleman and RCH Units, which are operated by Ascent. (ECF No. 388 at 5). While Ascent does not dispute that it operates the three wells in the Coleman Unit, it argues that these wells should not be included in the action because none of the wellbores from the three Coleman Unit wells cross the Shaw/Harvey parcels (Parcels 46 & 47). (*Id.*).

[8] Ascent admits that it held a working interest in both the Gold Digger South 3 and 4 Units while wells were in production but assigned their interests to Rice effective December 12, 2018. (ECF Nos. 424 at 28; 391-15). Therefore, if a jury finds wrongdoing, Ascent can be held liable for the period in which it contributed to and profited from drilling of this Unit. Further, the exhibit Plaintiffs cite to assert that a third party assigned their interest to Ascent on October 25, 2018 does not support that assertion. *See* 393-1, ¶ 13.

[9] It should be noted that none of the Recording Supplements attached as Exhibit V to Plaintiffs' Second Motion for Summary Judgment list Ascent as a working interest owner (ECF No. 386-2). (ECF No. 424 at 26). But the Assignment Agreements submitted as discovery by Ascent demonstrate that Ascent had an interest in these units at some point.

14

they combine their efforts, property, money, skill and knowledge, without creating a partnership . . . ." *Al Johnson Constr. v. Kosydar*, 42 Ohio St.2d 29, 325 N.E.2d 549 (Ohio 1975), paragraph one of the syllabus. The exhibits provided by Plaintiffs include the agreements Ascent executed when it assigned its interest in the leases to other Defendants and the operating agreements between the parties who operated or currently operate the wells. It is unsurprising that none of the operating agreements lists Ascent as a party because at present it has foreclosed its interests in all units except the Ross and the Coleman. Ascent, however, admits that it executed termination agreements for the other units, which implies that it held working or ownership interest in those properties and would have profited from that interest if the wells were in production at that time. (*See* ECF No. 391-1–391-2). A review of the Assignment Agreements demonstrates that Ascent held considerable interest in these pooled units related to royalties, easements, surface leases, and surface operations. *See* ECF No. 391-15.

This Court can infer that factors one and two of *O'Toole*—a joint contract and that defendants intended to form a joint venture—are met because Ascent held the leases within the pooled units and agreed to allow production of these leased properties as part of the pool. *Bennett*, 57 N.E.2d 776 at ¶ 5 of syllabus (a contract of joint adventure can be implied by action). Additionally, this Court can discern that Ascent shared in the profits and losses for the leases— satisfying factor five—because it assigned its revenue interest in the leases and reserved to itself any refunded costs from when it had an interest in the property. (ECF No. 391-1 at 1, 3).

Finally, factors three and four—contributing to the joint venture and a right to direct and control the joint venture—are also met because Ascent consented to the pooling of the leases in which it held oil and gas interests. (*See e.g.*, ECF Nos. 390-16; Gold Digger South 4 Declaration and Notice of Pooled Unit). For the Gold Digger South 4, the pooling unit declaration specifically

reserved to defendants the ability to alter their agreement by expanding the unit, changing the allocation of oil and gas attributable to the various lands, and dissolving the unit with the consent of all parties. (*Id.* at 4–5). For the Gold Digger South 3 and 4 Units, the Assignment Agreements demonstrate that Ascent had rights during the alleged time in which the leases were pooled and could exercise those rights according to the pooling agreements. (ECF Nos. 388 at 30–32; 424 at 28). Finally, Ascent admits that it had a working interest in leases within the Gold Digger South 3 and 4 Units, *see id.* at 32, during production of those pooled wells. *See Cosic v. Kronberg*, 2012-Ohio-5982, ¶ 18, 984 N.E.2d 414 (Ohio Ct. App. 2012) (finding a joint venture where there was joint profit resulting from combined business efforts).

Therefore, as it pertains to the Gold Digger South 3 and 4 Units, there exists no genuine dispute of material facts that Ascent was involved in a joint venture when it held leases in these properties. To avoid confusion, however, the Court finds that Ascent can only be held liable under a joint theory of liability for the periods in which it held an ownership or working interest in these two pooled units, as Ascent is not currently a signatory to any joint operating agreements. As such, Ascent's Motion for Summary Judgment as it pertains to the joint venture theory is **DENIED** for the Gold Digger South 3 and 4 Units, and Plaintiffs' Motion is **GRANTED** as to these Units.

The exhibits the parties cite for their respective arguments regarding the Snodgrass West Unit do not support their assertions. In its Motion for Summary Judgment, Ascent alleges that it assigned its interest in a lease in the Snodgrass West Unit to Gulfport with an effective date of June 1, 2017, prior to the well beginning production on June 5, 2017. (ECF Nos. 388 at 30; 424 at 27). A review of the Assignment Agreement cited by both Ascent and Plaintiffs, however, does not refer at all to the Snodgrass West Unit, but instead to the Condor East, Crozier Ridge B, and Perkins Units. (ECF No. 391-7). The amended exhibits submitted by Ascent also fail to clarify this

assertion. (ECF Nos. 402-6–402-8; 402-12). Therefore, there remains a genuine issue of material fact as to this Unit, and both Plaintiffs' and Ascent's Motions for Summary Judgment as to the application of the joint venture theory to the Snodgrass West is **DENIED**.

There still exist a genuine issue of material fact, however, as to the period during which Ascent could be held liable under a joint venture theory for the Gold Digger South 3 and 4 and Snodgrass West Units. The parties dispute when the period of liability, if any, should begin for Ascent.[10] While Plaintiffs cite the date the wells were drilled to completion to support their argument that their possessory interests were violated, Ascent argues that Plaintiffs' possessory interest could not been interfered with, if at all, until the beginning of production of the wells. (ECF No. 424 at 27). Ascent reasons that under Ohio law, to survive summary judgment on a trespass claim, landowners must show the defendant interfered with the reasonable or foreseeable use of the subsurface possessed by the landowner. (*Id.* (citing *Baatz v. Columbia Gas Transmission, LLC*, 929 F. 3d 767, 773 (6th Cir. 2019)). Ascent argues that the "reasonable or foreseeable use" of the subsurface is not just the drilling of the well but requires the production of oil and gas in this case, making the date of completion of drilling meaningless. (*Id.* at 28).

The issue is not when drilling was completed nor when production began, but when drilling of the Point Pleasant began, because Defendants were authorized to drill into the Utica Shale above the Point Pleasant. Under Ohio law, trespass requires that a property owner prove: (1) an unauthorized intentional act, and (2) an intrusion that interferes with the owner's right of exclusive possession of her property. *Estes v. Robbins Lumber, L.L.C.*, 2016-Ohio-8231, ¶ 16, 2016 WL 742107 at *2 (Ohio Ct. App. Dec. 19, 2016). As applied to subsurface rights, it has long been

---

[10] According to the Assignment Agreements, the period of Ascent's liability ended upon assignment of their property rights to the other Defendants. This occurred on: (1) December 12, 2018 for the Gold Digger South 3 and 4 Units; and (2) allegedly June 1, 2017 for the Snodgrass West Unit. (ECF No. 388 at 30). Plaintiffs fail to provide evidence for their assertions that the assignment occurred on a later date.

established in Ohio that a property owner can exclude invasion of her subsurface property where the invasion interferes with her "reasonable and foreseeable use of the subsurface." *Chance v. BP Chemicals, Inc.*, 1996-Ohio-352, 77 Ohio St. 3d 17, 26, 670 N.E.2d 985, 992 (Ohio 1996).

Plaintiffs allege that they reserved to themselves the right to drill and extract oil, gas, and other hydrocarbons from the Point Pleasant. (ECF No. 302; ¶ 50). This Court finds unconvincing Defendants' argument that drilling a well—a substantial physical invasion of Plaintiffs' property— but not extracting hydrocarbons does not constitute trespass. The wide array of discovery submitted to this Court indicates that drilling these wells and causing hydraulic fractures has a substantial impact on the stability and use of subsurface minerals, leading to the logical conclusion that Plaintiffs' reasonable and foreseeable use of the hydrocarbons in the Point Pleasant would be impacted. *See Briggs v. Sw. Energy Prod. Co.*, 657 Pa. 38, 61, 224 A.3d 334, 347–48 (Pa. 2020) (explaining that "[A]ll drilling for subsurface fugacious minerals involves the artificial stimulation of the flow of that substance. The mere act of drilling interferes with nature and stimulates the flow of the minerals toward artificially created low pressure areas, most notably, the wellbore."). Therefore, the reasonable and foreseeable use of the subsurface is both drilling wells and extraction of oil and gas. If trespass did occur, then it occurred when Defendants began drilling into the Point Pleasant—evidence of which is not before this Court. Therefore, a genuine dispute of material fact exists as to the date on which Defendants' alleged liability began, and the parties Motions are **DENIED** as to this issue.

### 4. *Gulfport Bankruptcy Settlement*

Gulfport argues that it is entitled to partial summary judgment on all damages claims that accrued prior to May 17, 2021, the bankruptcy settlement effective date. (ECF No. 394 at 5). In Gulfport's bankruptcy proceedings, they allege that they reached agreement with Plaintiffs to settle

fully and resolve "Settled Claims"—including claims set forth in Plaintiffs' proof of claims or "potential claims that claimants have or may have brought for pre-petition amounts or Administrative Expenses in Chapter 11 Cases." (*Id.* at 6 (*In re Gulfport Energy Corp.*, Bankr. S.D. Tex., No. 20-35562, ECF No. 1260 at 79)). Any "Reserved Claims" were those "forward-looking claims for all damages which accrue on or after [May 17, 2021] which have been or may be asserted in the TERA Litigation." (*Id.*). Plaintiffs agree that any claims they have against Gulfport related to the declaratory judgment, unlawful trespass, conversion, and unjust enrichment prior to May 17, 2021 were settled. (ECF No. 418 at 60). Plaintiffs argue, however, that they still have claims against Gulfport for the same actions that occurred after May 17, 2021 and for breach of royalty claims for the entire relevant time period because the royalty claims were not included in the settlement agreement (*Id.*). Because Gulfport assumed the leases, Plaintiffs allege that they had no right to assert the breach of contract claims. (*Id.* at 61).

Plaintiffs' argument regarding the royalty claims prior to May 17, 2021 must fail. First, the Settlement Agreement approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9010 states that the Claimants—Plaintiffs—agree to "compromise, settle, extinguish and resolved the Settled Claims" asserted against the Debtor—Gulfport. (ECF No. 394-5 at 2). Bankruptcy Rule 9010 requires notice to interested parties, specifically creditors, prior to settlement approval. Fed. R. Bankr. P. 9019(a). Therefore, there is no dispute that Plaintiffs, as creditors, received notice of the terms of the agreement. The Settled Claims included all claims set forth in Plaintiffs' proof of claim, and any "potential claims" that Plaintiffs could have brought for "pre-petition amounts." (ECF No. 394 at 6). A plain reading of these contractual terms demonstrates that Plaintiffs' pre-petition royalty claims were potential claims that they had against Gulfport as part of the *TERA II* litigation because they had already raised those claims in the *TERA II* Complaint. (ECF No. 427-

19

13); *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 374 N.E.2d 146 (Ohio 1978), paragraph two of the syllabus (explaining that courts must first review the plain and ordinary meaning of the language used in a contract "unless manifest absurdity results, or [ ] some other meaning is clearly evidenced from the face or overall contents of the instrument"). Although the addendum Plaintiffs submitted alongside their proofs of claim does not mention the breach of contract claim, the Amended Complaint Plaintiffs attached to the proofs of claim includes the breach contract claim—indicating that the royalty claims were actually raised before this Court. (*Id.*). The proof of claim was filed on January 23, 2021 in the Bankruptcy Court (Case No. 20-35562, Claim 69-1), about six months after Plaintiffs filed the Amended Complaint it attached to the proof of claim in this Court. (ECF No. 154).

Additionally, bankruptcy settlement orders are final, appealable orders that are afforded res judicata effect. *In re Licking River Mining, LLC*, 605 B.R. 153, 159 (Bankr. E.D. Ky. 2019); *see also, e.g.*, *Miller v. Lim (In re Miller Parking Co., LLC)*, 510 B.R. 123, 127 (E.D. Mich. 2014) (reviewing order approving settlement in bankruptcy as "final and immediately appealable"); *In re Reeves*, 521 B.R. 827, 833 (Bankr. E.D. Tenn. 2014) ("An order approving compromise and settlement under Fed. R. Bankr. P. 9019 has the same res judicata effect as any other final order with respect to the subject matter of the order." (citations omitted)); *Ritzen Grp., Inc. v. Jackson Masonry, LLC (In re Jackson Masonry, LLC)*, 906 F.3d 494 (6th Cir. 2018) (discussing the finality of orders in bankruptcy), *cert. granted*, —— U.S. ——, 139 S. Ct. 2614 (2019). The "purpose of res judicata is to promote the finality of judgments and thereby increase certainty, discourage multiple litigation, and conserve judicial resources." *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 487 F. Supp. 2d 914, 919 (S.D. Ohio 2007) (quoting *Westwood Chemical Co., Inc. v. Kulick,* 656

F.2d 1224, 1227 (6th Cir.1981) (citations omitted)). Therefore, Plaintiffs are barred from raising the pre-effective date royalty claims against Gulfport in this litigation.

Second, Plaintiffs argue they were unable to assert breach of contract for improper payment of royalties in the proofs of claims because Gulfport assumed the at-issue leases. (ECF No. 428 at 61). When describing the leases, however, Plaintiff points to a portion of the Bankruptcy Reorganization Plan which defines these leases as executory contracts. (ECF No. 418 at 61). Section 365 of the Bankruptcy Code, which covers executory contracts and unexpired leases, provides that the trustee (or debtor-in-possession ("DIP") in a Chapter 11 case) may not assume a contract or lease unless it cures, or provides adequate assurance to the court that it will promptly cure, the outstanding default. 11 U.S.C. § 365(b). Therefore, prior to assuming the leases Gulfport was required to cure all costs or provide assurances that it would cure all costs relating to the at-issue leases by the effective date or as soon as reasonably practicable thereafter. (ECF No. 418-25 at 61); *see* Fed. R. Bankr. P. 365(b). The assumption of these leases by Gulfport would have occurred after notice to the Plaintiffs and upon Court order, which was part of the confirmation of Gulfport's bankruptcy plan. (No. 20-35562, ECF No. 1262 at 52). As such, Plaintiffs would have been obligated to, at that time, raise the issue of unpaid royalties and allege to the Bankruptcy Court that Gulfport could not assume the leases because they had yet to cure the alleged royalty breach. By approving the assumption of the leases, it appears that the Bankruptcy Court found that the default was cured, or promptly would be cured. Therefore, pursuant to the bankruptcy code, Plaintiffs should now be precluded from arguing that there is an uncured pre-assumption default absent evidence to the contrary.

Therefore, this Court **GRANTS** Gulfport's Motion for Summary Judgment as it pertains to all claims against it by Plaintiffs prior to May 17, 2021.

## B. Count I: Declaratory Judgment

The parties submit cross-motions on Count I for Declaratory Judgment. Plaintiffs seek a declaration that the Utica Shale and Point Pleasant formations are separate geological formations and that they reserved to themselves the mineral rights in the Point Pleasant. Conversely, Defendants argue that this Court should grant summary judgment in their favor because they allege the contract terms give Defendants the authority to drill into the Point Pleasant.

### 1.  *Jurisdiction Over Plaintiffs' Declaratory Judgment Claim*

Defendants argue that this Court should not exercise its discretionary jurisdiction over Plaintiffs' declaratory judgment claim. (ECF No. 407 at 12–13). Specifically, Defendants allege a declaratory judgment would not settle this controversy because the remaining tort claims are the actual remedy sought by Plaintiffs. (*Id.* at 12–16). Conversely, Plaintiffs argue that a declaratory judgment would settle the controversy presented here because if this Court rules that the lease conveyed to Defendants the rights to drill the Point Pleasant, the tort claims must fail. (ECF No. 418 at 35). According to Plaintiffs, if the Court concludes that the leases did not convey to Defendants the rights to drill the Point Pleasant, then "Plaintiffs' breach of contract claims falls away and the parties can present evidence of damages for tort claims to a jury." (*Id.*).

The Declaratory Judgment Act provides that a district court "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). A district court has discretion to entertain a declaratory judgment action even where the court has subject matter jurisdiction. *Adrian Energy Assocs. v. Michigan Pub. Ser. Comm'n*, 481 F. 3d 414, 421 (6th Cir. 2007) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 277 (1995)). When deciding whether to exercise jurisdiction, courts must consider:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in

issue; (3) whether the declaratory action remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;" (4) whether the use of the declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy which is more effective.

*Travelers Indem. Co. v. Bowling Green Pro. Assoc., PLC*, 495 F.3d 266, 271 (6th Cir. 2007)

(quoting *Grand Turk W. R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984)).

Factor one—whether the declaratory judgment would help settle the controversy—and factor two—whether it would help clarify the parties' legal relationship—weigh in favor of this Court exercising jurisdiction over Plaintiffs' claim. *Scottsdale Ins. Co.*, 513 F.3d at 557 ("[I]t is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue."). While resolution of the declaratory judgment would not settle the entire controversy, resolution of Plaintiffs' declaratory judgment claim would settle the threshold, and crucial, matter of whether Defendants acted outside the bounds of the lease. If the Defendants had the right to drill the Point Pleasant, the tort claims would be moot. Even if Defendants lacked authority to drill the Point Pleasant, in both scenarios, a decision on the declaratory judgment serves a useful purpose because it would clarify the legal relationship between the lease parties. *In re Murray Energy Holdings Co.*, 637 B.R. 820, 824 (Bankr. S.D. Ohio 2022). Certainty on the parties' rights under the leases would allow the parties to proceed without risk of future litigation. *J.M. Smucker Co. v. Promotion in Motion, Inc.*, 420 F. Supp. 3d 646, 663 (N.D. Ohio 2019) (finding useful a declaratory judgment in clarifying the parties' legal relations as to whether the phrase "Fruit is our 1st Ingredient" was a valid trademark because defendant who wished to use it, was curtailed in marketing and promotional endeavors by plaintiff's legal threats).

Factors three and four are neutral. There is no evidence that the claim is being used for procedural fencing or for a race for preclusion, nor that the factual questions at issue are so unique that comity is threatened, and the issue would be better suited for state court.

Defendants argue that factor five—whether there is a more effective remedy—weighs against exercising jurisdiction here. To decide the tort claims, however, this Court must assess whether Defendants had the right to drill into the Point Pleasant—addressing the same question at issue in the declaratory judgment. The claims raised are so intertwined that judicial economy counsels against dismissing the declaratory judgment claim while adjudicating the claims for damages. Therefore, the benefit of saving judicial resources by opting not to exercise jurisdiction over the declaratory judgment is inapplicable here. *Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*, 481 F.3d 414, 422–23 (6th Cir. 2007) ("When a plaintiff seeks relief in addition to a declaratory judgment, such as damages or injunctive relief, both of which a court *must address,* then the entire benefit derived from exercising discretion not to grant declaratory relief is frustrated, and a stay or dismissal would not save any judicial resources."). Therefore, the *Grand Turk* factors weigh in favor of exercising jurisdiction over the declaratory judgment claim, and Defendants Motion as it pertains to this issue is **DENIED**.

### 2. *Plaintiffs' Arguments*

The Grant Clause of the leases states that the Plaintiffs leased to the Defendants minerals "in the formations commonly known as the Marcellus Shale and the Utica Shale." (ECF No. 145 at 16). Plaintiffs assert that the term "formation" must be given its geological meaning—a fundamental rock unit separated from different rock units with distinctive properties—because it proceeds and defines the terms "Marcellus Shale" and "Utica Shale." (*Id.* at 16–17; ECF No. 418

at 7). Therefore, they assert that the plain language demonstrates that the Plaintiffs reserved for themselves all oil and gas in the Point Pleasant. (ECF No. 145 at 16; 418 at 5; 426 at 1–2).

Plaintiffs argue that industry use of "Utica Shale" or the parties' intent at the time of negotiation does nothing to support Defendants' interpretation. (ECF No. 418 at 11–15; 23–24 (noting that parol evidence is impermissible where there is an integration clause and where the evidence introduces a latent ambiguity to the contract terms)). They assert that the industry identified the Point Pleasant as a distinct geological formation from 2011–2013, and the ODNR recognized the Utica and Point Pleasant as different geological formations beginning in 2012— when many of the lease terms were negotiated. (ECF Nos. 386 at 27; 418 at 18–22). Additionally, Plaintiffs reference Defendants' internal business documents discussing concerns that the leases did not give them rights to the Point Pleasant. (*Id.* at 26–27; ECF No. 386 at 14–19).

Plaintiffs maintain that there is no deposition testimony to support Defendants' argument that Plaintiffs would have understood the industry use of "Utica Shale" as including the Point Pleasant because of attending the Smith Goshen Group meetings. (*Id.* at 22; ECF No. 418 at 17). Plaintiffs assert that they negotiated independent leases with Rice with language specific to the Marcellus and Utica Shales after they refused to join the Smith Goshen Group, did not sign the proposed leases, and stopped attending meetings. (ECF Nos. 145 at 19; 386 at 26; 476 at 5–7). Plaintiffs maintain that although they received emails from *GoMarcellusShale* and *Weekly Shale*, oil and gas related publications, that referred to the difference between the formations, there is no evidence that Plaintiffs read those emails. (*Id.* at 5). According to Plaintiffs, receipt of these emails and membership in the Ohio Valley Oil and Gas Association does not make them members of the oil and gas industry, but simply landowners wanting to learn about the industry. (*Id.* at 10–11).

Finally, Plaintiffs argue Ohio adopts the following canons of contract construction: (1) the *expression unius est exclusion alterius* canon, which establishes that the express inclusion of one thing implies the exclusion of the other; and (2) the doctrine of *ejusdem generis* which establishes that where general words precede a more specific description, the general words are restricted by the more descriptive words. (ECF No. 418 at 28–30). In applying these canons, Plaintiffs assert that the term "Utica Shale" in the leases can only cover the geological formation definition and was not intended to include the Point Pleasant formation. (*Id.* at 30).

### 3. Defendants' Arguments

Defendants respond that they can drill into the Point Pleasant because it is part of what is "commonly known as . . . the Utica Shale." (ECF No. 407 at 4–5). Defendants define "commonly known" as "to generally acknowledge," "publicly known," "commonly called," "commonly recognized," or "general knowledge." (*Id.* at 5). Defendants point to Mr. Cain's deposition testimony that it was generally understood that the formation "commonly known" as the Utica Shale include the Point Pleasant, (*see* ECF No. 388 at 3; 424 at 11–13), and Defendants mistakenly focus instead on the technical term, "formation" (ECF Nos. 415 at 8; 389 at 24).

Second, Defendants allege that Plaintiffs fail to provide any evidence that the public understood the Point Pleasant and Utica Shale formations as distinct. (ECF No. 427 at 4). Defendants assert that every expert's testimony, uniform industry usage of the terms, the parties' course of performance, late-produced emails and geological newsletters, Plaintiffs' membership in Ohio Valley Oil and Gas Association, Plaintiffs' attendance of Smith-Goshen Group and industry meetings, and the ODNR's decision to approve Defendants' pooled units that included wells drilled into the Point Pleasant all indicate that Plaintiffs were aware of the Utica Shale's broader meaning. (ECF Nos. 407 at 8–9; 389 at 11–12, 26–30; 415 at 15; 424 at 13–14; 477 at 2–

3, 6–9). And further, that Plaintiffs took the Reservation Clause language directly from the Smith-Goshen Group leases. (ECF No. 388 at 3; 477 at 8–9). Defendants claim that the ODNR's findings did not determine that the leases excluded the Point Pleasant, but that similar leases included it. (ECF No. 415 at 5). Because Plaintiffs failed to produce these documents during discovery and were later compelled by Court Order (ECF No. 430), Defendants claim they could never question Plaintiffs about their knowledge of these documents. (ECF No. 477 at 6).

Third, Defendants argue that Plaintiffs' interpretation creates "manifest absurdity" because Defendants would not have entered into the leases without access to the Point Pleasant. (ECF Nos. 407 at 9; 388 at 26; 389 at 30; 424 at 3). Defendants assert that they could have sought forced unitization of Plaintiffs' properties under Ohio statute and paid 12.5% in royalties, instead of the current 20% rate. (ECF No. 389 at 31–33; 424 at 4). Further, Plaintiffs accepted royalties from Defendants for years, while understanding that the Point Pleasant interval of the Utica Shale produces the most oil and gas. (ECF No. 389 at 31–33). When Rice and Gulfport negotiated to assign their interests to Ascent, Ascent denies Plaintiffs' assertion that it ever stated that the leases never conveyed the rights to the Point Pleasant during contract negotiations. (ECF No. 424 at 7). Rather, Ascent asserts that testimony from its corporate executives demonstrates that it understood the Utica Shale to include the Point Pleasant. (*Id.* at 7–8).

Finally, Defendants assert that Plaintiffs' interpretation of the contract language creates a latent ambiguity, by introducing extrinsic evidence about geological definitions of the formations, while simultaneously arguing that their definition of the Utica Shale is apparent from the plain lease language. (*Id.* at 10–11; 388 at 10). Instead, Defendants point to energy-focused media articles, published presentations by industry experts, emails and newsletters received by Plaintiffs, and internal business documents that repeatedly refer to the Point Pleasant as a geological

formation within the larger Utica Shale for ease, despite understanding that they were geologically distinct rock formations. (ECF Nos. 388 at 10–25; 389 at 4–11; 427 at 3; 477 at 2–4).

### 4. Court's Findings

The Ohio Supreme Court has not yet ruled on defendants' appeal in *TERA, LLC* on the issue of how to interpret the at-issue contract language. If a state supreme court has yet to address an issue, the federal courts must predict how the court would rule. *Allstate Ins. Co.*, 249 F.3d at 453–54. Relevant data include "decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [Ohio] Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir. 1995); *Amerisure Mut. Ins. Co. v. Carey Transp., Inc.*, 578 F. Supp. 2d 888, 898 (W.D. Mich. 2008) (quoting *Appalachian Raicar Servs, Inc. v. Boatright Enterprises, Inc.*, 602 F. Supp. 2d 829, 846 (W.D. Mich. 2008) ("In anticipating that the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'") That said, a "federal court is not bound by the decision of state lower court[s] where there has been no determination of a question of state law by the state's highest court." *Krakoff v. United States*, 431 F. 2d 847, 849 (6th Cir. 1970).

The district court should not award summary judgment when there exists a "genuine issue of material fact regarding ambiguous terms in [a] contract." *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008). In those instances, "a jury and not a judge must consider extrinsic evidence when the contract's language does not make clear the intent of the parties." *Id.* Contract language is ambiguous if it is subject to two reasonable interpretations. *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996); *Career & Tech. Assn. v. Auburn Vocational Sch. Dist. Bd. of Edn.*, 2014-Ohio-1572, ¶ 36, 2014

WL 1478838, at *6 (Ohio Ct. App. Apr. 14, 2014). A court must first determine that a contract provision is ambiguous before "it may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence." *Id.* This Court "may not, however, use extrinsic evidence to create an ambiguity," *id.*; instead, "the ambiguity must be . . . apparent on the face of the contract." *Id.* Finally, while a determination whether a contract is ambiguous is considered a question of law, the meaning of the ambiguous words or phrases in the contract are a question of fact. *Ohio Hist. Soc'y v. Gen. Maint. & Eng'g Co.*, 65 Ohio App. 3d 139, 146, 583 N.E.2d 340, 344 (Ohio 1989).

In Ohio, oil and gas leases are "contract[s] subject to traditional rules of interpretation and construction." *Shanesville Investments LLC v. Eclipse Resources I, LP*, 358 F. Supp. 3d 665, 669–70 (S.D. Ohio 2018). As such, this Court must first decide as a question of law whether the phrase "commonly known as the Utica Shale" is ambiguous. Unfortunately, the leases do not define independently the phrase and the parties disagree on its meaning; therefore, this Court, like the Ohio courts in *TERA, LLC*, must look to other context clues. *Cf. Utica Shale Hanuman Chalisa, LLC v. BoMar Contracting, Inc.*, 2022-Ohio-1111, ¶ 43, 187 N.E.3d 1108, 1119–20 (Ohio Ct. App. 2022) (concluding that court did not need to consider evidence outside the written agreement to discern the parties' intent, because meaning of "reasonable overhead and profit" was set forth in a later portion of contract by setting out an exact margin of 5% for overhead and profit).

While Plaintiff and the Ohio Court of Appeals interpreted the words "commonly known as" simply to reinforce the contract canon of interpretation that courts should rely on the common meaning of the words, *see TERA, LLC*, 2023-Ohio-273, ¶ 50, it applied the "technical stratigraphic meaning" of Utica Shale, demonstrating that the "common meaning" of the term inherently relies on evidence extrinsic to the lease. Unlike in *Alexander* where the court found that the affidavit of

one driller was insufficient to raise a genuine issue of material fact as to the meaning of "oil" and "gas," here both parties present substantial evidence from emails, industry presentations, communications, and deposition testimony that demonstrate competing theories of the lease's meaning. In other words, "Utica Shale" reasonably could be given multiple definitions by those across the scientists, landowners, and drilling companies that make up the oil and gas industry. The evidence presented by both parties demonstrates that the qualifying language of "commonly known as" introduces ambiguity into how "Utica Shale" should be defined.

Even though extrinsic evidence of custom or trade usage cannot vary the express terms of a contract, such "evidence is permissible to show the parties to a written agreement employed terms having a special meaning within a certain geographic location or a particular trade or industry, not reflected on the face of the agreement." *TERA, LLC.*, 2023-Ohio-273, ¶ 41 (citing *Alexander*, 53 Ohio St.2d at 248). Moreover, technical terms and words of art are given their technical meaning when used in a transaction within their technical field. *Sutton Bank v. Progressive Polymers, L.L.C.*, 161 Ohio St. 3d 387, 391–92, 2020-Ohio-5101, 163 N.E.3d 546, 551–52 (Ohio 2020); *Career & Tech. Assn.*, 2014-Ohio-1572, ¶¶ 28-30 (concluding that the term "eighth period stipend" was a technical term not defined by Ohio law and witness testimony demonstrated that it was open to different interpretations). The Ohio Court of Appeals specifically relied on the stratigraphic definition of "Utica Shale" in *TERA, LLC*, but the fact that the parties here present two reasonable interpretations demonstrates that ambiguity remains as to which definition should be applied to the leases. Even though the parties acknowledge that the stratigraphic meaning of the Utica Shale does not include the Point Pleasant, Defendants raise a genuine issue of material fact as to whether the parties intended the contract language to reflect the technical stratigraphic meaning of the words or the common industry usage.

Further, this Court finds that the Ohio Court of Appeals' decision provides little substantive guidance in this matter as the circumstances of the cases are different. While the cases address the same lease language and have parties in common, this case contains new evidence of the contract negotiations, which was not available in *TERA, LLC*. Further, this is a new issue of law, and this Court lacks a wealth of Ohio caselaw on which it can rely. Therefore, summary judgment is inappropriate, and both Plaintiffs and Defendants' cross motions for summary judgment on the declaratory judgment claim are **DENIED**.

### C.  Count II: Trespass

#### *1.  Plaintiffs' Arguments*

Plaintiffs argue that if this Court finds that Plaintiffs' leases unambiguously reserve the right to drill into the Point Pleasant to Plaintiffs, then Defendants have committed a trespass by drilling and producing from the Point Pleasant below Plaintiffs' property. (ECF No. 145 at 24). Plaintiffs point to Defendants' ODNR records certifying that they drilled into the Point Pleasant on Plaintiffs' property. (ECF No. 145 at 24). Further, Plaintiffs maintain that Defendants' trespass was willful because they knew there was a risk that the leases did not cover the Point Pleasant but recklessly drilled anyway. (ECF No. 386 at 15–19, 30–32; 426 at 2–3). For example, Plaintiffs point to deposition transcripts and email correspondences between Rice and former Defendant XTO in which XTO raised concerns about whether the contract language assigned drilling rights to the Point Pleasant to Defendants. (ECF No. 386 at 15–19). Plaintiffs reject Defendants' argument that these conversations were negotiating tactics, not tacit acceptance that they were operating outside the bounds of the leases. (ECF No. 424 at 13–14). When Plaintiffs' affiliate, TERA, LLC, filed a lawsuit in Belmont County Court of Common Pleas in October 2017 asserting identical claims to those raised here, Plaintiffs allege that Defendants continued to produce from

the disputed wells. (ECF No. 386 at 21). Even when Plaintiffs challenged Defendants' legal position by filing this lawsuit, Plaintiffs allege that Rice and Ascent still drilled additional wells in the Skyhawk and Coleman Units. (ECF No. 426 at 10). Because mistake of law is not a defense to trespass, Plaintiffs maintain that Defendants' arguments are unsound. (ECF No. 386 at 15–19).

Plaintiffs also point to an analysis conducted by Defendants, which indicates that hydraulic fractures may extend from the wellbores between 425'–500', meaning that Defendants are draining oil and gas from about 200-215 acres surrounding each well. (ECF No. 418 at 37–39). Plaintiffs assert that these hydraulic fractures extend into Plaintiffs' properties and serve as further proof of physical invasion. (*Id.* at 39). Additionally, Plaintiffs argue that the pooled nature of the leases gives Plaintiffs a possessory interest in the entire pooled unit acreage. (*Id.* at 41). As such, where there has been a physical invasion by a wellbore of Plaintiffs' property, the rule of capture does not apply. (*Id.* at 40–41). The rule of capture permits a property owner to drill for and produce oil and gas from his or her own land even if that would result in draining oil and gas from below the property of a neighbor. *Barnes v. Res. Energy Expl.*, 2016-Ohio-4805, ¶ 29, 68 N.E.3d 133, 141 (Ohio Ct. App. 2016). Where the rule of capture applies, according to Plaintiffs, it has been limited under Ohio law by the doctrine of correlative rights, which requires a landowner to avoid negligence and waste—an accusation made by Plaintiffs against Defendants. (*Id.* at 41).

Plaintiffs also maintain that they have proven their ownership of the oil and gas interests at issue in this case by attaching the deeds and titles to the oil and gas mineral estates for each Plaintiff. (ECF No. 424 at 15–16). Plaintiffs assert that Defendants acknowledge their ownership interest by paying royalties for the oil and gas extracted from their properties. (*Id.* at 16). Therefore, Plaintiffs maintain that the evidence proves they possessed these properties, and that the trespass occurred on their land.

## 2. Defendants' Arguments

Defendant alleges the following: (1) Plaintiffs have not proven physical invasion of their property necessary to allege trespass; (2) Plaintiffs have not proven they had a possessory interest in the property at the time of the alleged tort; and (3) the evidence proves Defendants' good faith exploration of the Point Pleasant. (ECF Nos. 407 at 21; 414 at 2; 10–17; 415 at 35–43).

Defendants argue that several of Plaintiffs' properties on which they claim Defendants trespassed do not have a well or wellbore beneath them, *see* ECF No. 414 at 4–5, and Plaintiffs offer no expert testimony to support a showing of physical invasion. (ECF No. 389 at 35). They maintain that Plaintiffs cannot argue that hydraulic fracturing or "mere hydrocarbon drainage is enough to show trespass for a property that is not physically invaded." (*Id.* at 5; *see also* ECF Nos. 415 at 22–23; 427 at 35). Additionally, Defendants allege that the doctrine of correlative rights cannot be used to argue that the rule of capture does not apply here because there are no allegations that Defendants acted in a negligent or wasteful manner. (ECF No. 427 at 36–37). Further, Defendants argue that subsurface interests can be severed from the surface estates; therefore, because Plaintiffs do not plead the nature of their ownership of the subsurface, they have failed to evidence ownership of the Point Pleasant at the time of the alleged tort. (*Id.* at 6–8; 427 at 37).

Ascent argues that the only Ascent-operated well that traverses a portion of the Plaintiffs' property is the Ross wellbore. (ECF No. 415 at 26–27). Because there is no physical invasion by the wellbores and there is no way to determine if hydraulic fractures reached Plaintiffs' property, Ascent maintains that trespass cannot stand. (ECF No. 424 at 18–19). Further, Ascent argues that Plaintiffs' position that: (1) hydraulic fractures, or extracting natural gas from hydraulic fractures, amounts to trespass; and (2) that pooled units provide possessory interests to all lessors whose properties are included in the unit necessarily fail under Ohio law. (*Id.* at 19 n. 5).

33

Finally, Defendants argue that this Court should grant summary judgment as to the following wells and properties because they allege that Plaintiffs present no evidence of physical invasion, which is required to plead a trespass claim: (1) Dorsey 2A well in Dorsey East; (2) Snodgrass 1B well in Snodgrass West; (3) Skyhawk 10 well in Skyhawk; (4) Gold Digger 3H well and the two untouched properties in the Gold Digger; (5) one of the properties untouched by the Ross 11H well in the Ross SE RCH BL; and (6) all of the property in the Gold Digger 10, which Defendants allege is not owned by Plaintiffs. (ECF No. 427 at 34–35).

### 3.  *Court's Analysis and Findings*

As detailed *supra*, there exists a genuine dispute of material fact as to whether the leases give Defendants the authority to drill and extract minerals from the Point Pleasant. If the Defendants have the authority to drill, Plaintiffs' claim for trespass would fail. If Defendants do not have authority to drill, Plaintiffs' trespass claim could succeed. Until that question is answered, there exists a genuine dispute of material fact as to whether Defendants trespassed on Plaintiffs' property by drilling into the Point Pleasant below those properties.

It has long been established that Ohio does not recognize absolute ownership by a landowner to everything below the surface of their properties. *Chance*, 670 N.E.2d at 992 (citing *Willoughby Hills v. Corrigan*, 29 Ohio St.2d 39, 49, 58 O.O.2d 100, 105, 278 N.E.2d 658, 664 (Ohio 1972)). State precedent, however, does acknowledge that a landowner's subsurface rights include "the right to exclude invasions of the subsurface property that actually interfere with [the landowner's] reasonable and foreseeable use of the subsurface." *Id.* On the matter of subsurface rights, Ohio courts conclude that for a plaintiff to recover for trespass, the plaintiff must demonstrate "some type of physical damages or interference with use." *Baker v. Chevron U.S.A. Inc.*, 533 Fed. App'x 509, 521–22 (6th Cir. 2013) (quoting *Chance*, 670 N.E.2d at 993) (plaintiffs

could not recover damages for trespass where water injectate migrated into plaintiffs' subsurface properties as claim that properties were contaminated was insufficient evidence to demonstrate physical damage or interference with reasonable and foreseeable use of the subsurface).

Trespass requires an unauthorized intentional act, and entry upon land in possession of another. *Georgetown of the Highlands Condo. Owners' Ass'n v. Nsong*, 2018-Ohio-1966, ¶ 36, 113 N.E.3d 192, 199–200 (Ohio Ct. App. 2018). Trespassing creates a presumption of willful conduct on the part of the trespasser and requires the defendant to prove by a preponderance of the evidence that he acted in good faith. *TERA, LLC*, 2023-Ohio-273 at ¶55. Determining the existence of good faith is a question of fact "to be arrived at by the trier of facts from all the relevant material evidence adduced in the case." *Id.* Unlike in *TERA, LLC*, where the court concluded that there was only one reasonable interpretation of the Reservation Clause and therefore there were no facts by which the drilling companies could demonstrate a good faith belief in their right to drill and extract from the Point Pleasant, the parties have both presented sufficient evidence that there remains a genuine dispute as to the meaning of the phrase "commonly known as the Utica Shale."

Plaintiffs have established their ownership rights to the minerals underlaying the properties they allege have been impacted by Defendants' actions. First, Plaintiffs provide the deeds for each property and the Declarations and Notice of the pooled units in which their properties were pooled. (ECF Nos. 426 at 17–19; 386-1; 145-1). Referencing certain language in the deeds, which exempts from the conveyance any previously conveyed "rights-of-way and/or minerals on record," Defendants argue that Plaintiffs have failed to prove their ownership of the mineral rights in the Point Pleasant. Apart from the fact that Defendants themselves asserted that Plaintiffs held ownership of the subsurface mineral interest in the negotiated pooling declarations, Defendants also fail to provide any evidence that Plaintiffs *do not* own the mineral rights in the Point Pleasant.

A "deed executed in the correct form is presumed to be valid and will not be set aside except upon clear and convincing evidence." *Henkle v. Henkle*, 75 Ohio App. 3d 732, 735, 600 N.E.2d 791, 793–94 (Ohio Ct. App. 1991). Further, in each of the plat map exhibits in which the surface and subsurface ownership rights are separated out, Plaintiffs are listed as owning both the surface and subsurface rights they claim are trespassed by Defendants. Based on the parties' actions and no documents indicating otherwise, Defendants fail to meet the burden required to have summary judgment granted in their favor. Therefore, there is no genuine dispute of material facts as it pertains to Plaintiffs' ownership interest in these properties.

For those properties which are crossed by a well or wellbore that was intentionally drilled by Defendants, there is no question that they entered the properties intentionally. Plaintiffs argue that in addition to the properties crossed by wellbores, hydraulic fractures that are created emanate from the wellbores also constitute physical invasion of Plaintiffs' properties, making Defendants liable for trespass for those properties which contain hydraulic fractures.

The elements of common law trespass require Plaintiffs to prove that Defendants entered Plaintiffs' land. This requires a location-specific inquiry, which is important given the pooling unit structure in which the leases are held. In a pooled unit, the royalty benefits from any well are distributed across all landowners in the pool, even where a well on one property will only (or primarily) drain oil or gas from below that property, and not from below the other property. *See Golden Eagle Resources II, LLC v. Rice Drilling D, LLC*, Case No. 2:22-cv-2374, ECF No. 22 at 13 (S.D. Ohio Feb. 10, 2023). Other federal district courts have concluded that in pooled units a mineral owner "no longer owns a full interest in their respective individual tracts; rather, after pooling they own undivided interest in the entire pooled unit in the proportion that each owner's contribution bears to the pooled unit." *PYR Energy Corps. v. Samson Res. Co.*, 456 F. Supp. 2d

786, 796 (E.D. Tex. 2006). As detailed in *J&R Passmore, LLC*, however, this Court is unable to identify a similar ruling in Ohio nor were Plaintiffs able to provide one. 2023 WL 2667749, at *20. In other words, there is no evidence that Ohio's oil and gas pooling laws usurp the physical invasion requirement to prove trespass under Ohio common law.

Plaintiffs' argument goes against the weight of Ohio precedent which establishes that landowners alleging trespass must demonstrate interference with their possessory interest. *See e.g.*, *Baatz v. Columbia Gas Transmission, LLC*, 929 F.3d 767, 773 (6th Cir. 2019) (citing *Chance*, 670 N.E.2d at 991–92) (Under Ohio law, subsurface ownership rights are limited, and "to survive summary judgment on [a] trespass claim (whether direct or indirect), Landowners must show that Columbia Gas interfered with the [reasonable or foreseeable] possessory interest in their subsurface."). Further, the Ohio statute Plaintiffs cite for their proposition that an individual lessor gains possessory interests in the entire pooled unit once joined, specifically reserves the original possessory interests in the property to each lessor: "[N]o order providing for unit operations shall be construed to result in a transfer of all or any part of the title of any person to the oil and gas rights in any tract in the unit area." OHIO REV. CODE § 1509.28(M). While Plaintiffs may have royalty rights related to the entire pooled units, those rights do not translate to possessory rights under current Ohio law. *See e.g., Golden Eagle Resources*, Case No. 2:22-cv-2374, ECF No. 22 at 13; 22 (finding argument that trespass on a portion of a pooled unit results in trespass on all leases within that unit deficient as a matter of law).

Plaintiffs advance a claim for willful trespass, which creates the additional burden on Defendants to prove good faith. On January 2, 2014, two days after Plaintiffs signed their leases, Rice issued an internal memo stating that it was Rice's position that the lease language granted them the "right to develop the Utica/Point Pleasant formation without specifically stating the words

'Point Pleasant' in the lease." (ECF No. 386 at 15–16). While the Plaintiffs argue that this is strong evidence of bad faith as the memorandum was meant to justify Rice's position when trying to trade the leases with other operators, Defendants argue that the memo memorialized the parties' understanding of the term's industry usage and its meaning within the leases. As there exist more than one reasonable interpretation of the lease language, there also exists a genuine issue of material fact as to whether Defendants acted in good faith when drilling into the Point Pleasant.

For all alleged tort claims, Plaintiffs must demonstrate that Defendants improperly infringed upon a right or benefit held by Plaintiffs as related to their specific plot of land. Plaintiffs have done so with plat maps that show wellbores crossing some of Plaintiffs' properties. As discussed *supra*, a physical invasion of Plaintiff's property by wellbores, regardless of whether the wells are in production, interferes with the reasonable and foreseeable use of the subsurface property. As it relates to hydraulic fractures, however, Plaintiff's evidence is substantially lacking. While the scientific studies Plaintiffs cite detail that hydraulic fractures can reach up to 1000 feet from a wellbore (ECF No. 432), Plaintiffs have provided no evidence that wellbores fractures actually physically intersect those properties not crossed by a wellbore. Regardless of the outcome of the declaratory judgment claim, Plaintiffs cannot prove trespass for those properties. Therefore, for Count II – Trespass, Plaintiff's Motion for Summary Judgment is **DENIED,** and Defendants' Motion for Summary Judgment is **DENIED in part**, but **GRANTED in part** for the following because Plaintiffs cannot prove physical invasion of these properties:

- **Thomas Shaw and Joyce Chambers:** Plot 46 as it relates to the Dorsey 2A.
- **TERA II:** Plots 24, 25, and 46 as it relates to the Dorsey East 2A.
- **TERA III Honza, LLC:** (1) Plots 10 and 11 as it relates to the Snodgrass West 1B; and (2) Plots 20 and 21 as it relates to the Skyhawk 3 SCL5H10, and plot 20 as it relates to Skyhawk 3 SCL5H12.
- **TERA IV:** (1) Plots 2 and 9 as it relates to the Gold Digger 1H and Plots 2, 9, 10, and 11 as it relates to the Gold Digger 3H; (2) any plots crossed by the Gold Digger 10; (3) plots 83, 84, and 85 as it relates to the Son-Uva Digger North 1H, plots 82, 84, and 85 as it relates

to the Son-Uva Digger North 3H, and Plots 82 and 84 as it pertains to the Son-Uva Digger North 5H-A; and (4) plot 47 as it relates to the Coleman RCH BL 1H, 2H, and 4H.

- **Jeannine Shaw and Scott Harvey:** Plot 8 as it relates to the Ross SE RCH BL 11H.

(ECF Nos. 418 at 37–38; 432 at 34–35).

### D. Counts III & IV: Conversion and Unjust Enrichment

*1. Plaintiffs' Arguments*

According to Plaintiffs, while Ohio does not permit a claim of conversion for the taking of real property, an exception exists where the entity exercises control over payments related to oil and gas that belonged to another. (ECF No. 386 at 32–33 (citing *Gorsha v. Clark*, No. 2:18-cv-508, 2022 WL 278973, at *3–4 (S.D. Ohio Jan. 31, 2022)); 418 at 49–51). Plaintiffs argue that Defendants have converted their oil and gas and been unjustly enriched from its sales revenue. (ECF No. 386 at 34). Plaintiffs reassert that they have a proportionate possessory interest over the entire pooled unit and are entitled to a proportionate share of its production. (ECF No. 426 at 23–24). Especially because it is nearly impossible to assess from where the oil and gas is extracted, Plaintiffs allege that the proportionate share model protects their rights under Ohio law. (*Id.*).

*2. Defendants' Arguments*

Defendants allege that Plaintiffs' conversion and unjust enrichment claims must fail because they were authorized to drill into the Point Pleasant, Plaintiffs fail to prove their possessory rights in the property at issue, and they plead that the objects of their conversion claim are the hydrocarbons, in violation of Ohio law. (ECF Nos. 414 at 17–18; 389 at 36). Defendants distinguish *Gorsha*, arguing that the defendants in that case wrongfully converted the royalty payments owed to plaintiffs that owned mineral rights, not that defendant exercised control over the mineral rights themselves. (*Id.* at 18). Defendants maintain that Plaintiffs fail to demonstrate that their oil and gas was the object of conversion or unjust enrichment because they did not trace

nor provide expert testimony about oil or gas drained from their properties. (*Id.* at 19; ECF Nos. 415 at 27–28; 424 at 16–21). Defendants argue that this is a highly technical issue and cannot be an assertion based on speculation. (ECF No. 414 at 28–33). Finally, Defendants assert that even if oil and gas was drained through fractures or otherwise from Plaintiffs' property, the rule of capture allows Defendants to produce that oil and gas. (ECF No. 389 at 37).

### 3. Court's Finding and Analysis

An oil and gas lease is an "agreement by the lessee to develop the premises for oil and gas and pay royalties thereon to the lessor." *Chesapeake Exploration, L.L.C. v. Buell*, 2015-Ohio-4551, ¶ 16, 144 Ohio St. 3d 490, 493, 45 N.E.3d 185, 189 (Ohio 2015) (citing 1 Brown, Brown & Gillaspia, *The Law of Oil and Gas Leases,* Section 3.01(2) (2d Ed.2014)). Ohio recognizes that minerals underlying the surface that remain underground are "part of the realty." *Pure Oil Co. v. Kindall*, 116 Ohio St. 188, 201–202, 156 N.E. 119 (Ohio 1927). These minerals can be severed from the surface realty for purposes of separate ownership. *Chesapeake Exploration, L.L.C.*, 2015-Ohio-4551, ¶ 21–22. Even when separately owned, the subsurface minerals remain real property until they are extracted at which point the minerals "become personal property immediately upon severance." *Schlabach v. Kondik*, 2017-Ohio-8016, ¶ 23, 98 N.E.3d 1048, 1055 (Ohio Ct. App. 2017) (citing *Terteling Bros., Inc. v. Glander*, 151 Ohio St. 236, 243, 85 N.E.2d 379 (Ohio 1949)). Like the parties here, the owner of the mineral estate can convey to another the rights to subsurface minerals. *See, e.g., Brown v. Fowler*, 65 Ohio St. 507, 521, 524, 63 N.E. 76 (Ohio 1902) (an instrument granting the oil and gas, along with the land for the purposes of obtaining the oil and gas, is a lease, and not a license, for a definite and certain term); *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 128, 48 N.E. 502 (1897) (even if the lease is termed a sale of all the oil underlying the land, oil remaining under property after the lease expires belongs to the landowner).

Conversion is the "exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (Ohio 1990). A plaintiff must prove: "(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *6750 BMS, L.L.C. v. Drentlau*, 2016-Ohio-1385, ¶ 28, 62 N.E.3d 928, 934 (Ohio Ct. App. 2016). A conversion claim can only be asserted for personal property, not real property. *First Fed. Bank v. Angelini*, 2007-Ohio-6153, ¶ 8 (Ohio Ct. App. 2007). Plaintiffs' asserts conversion of "gas stolen from Plaintiffs' Point Pleasant Formation." (ECF No. 386 at 34). Because minerals become personal property upon extraction from the subsurface, Plaintiffs claim for conversion is properly asserted.

As detailed *supra*, Defendants fail to challenge sufficiently Plaintiffs' ownership or right to possession of the subsurface minerals at issue. Therefore, prong one—regarding plaintiff's ownership or right to possession of the property—has been established.

As part of prong two—defendant's conversion by a wrongful act or disposition of plaintiff's property rights—Defendants argue that Plaintiffs fail to establish that Defendants converted oil and gas extracted from their particular property. (ECF No. 389 at 37). Plaintiffs declare, and Defendants agree, however, that it is impossible to know exactly where each particle of oil or gas produced originated, even with expert testimony. *See* ECF Nos. 426 at 23; 386-45). This is an issue of first impression because Plaintiffs do not allege conversion of royalties owed, but conversion of the oil and gas extracted from the pooled units in which Plaintiffs' properties are included. That said, Defendants' argument must fail as a matter of law and public policy.

Given oil's fugacious nature, "it is not confined by the artificial boundaries of surface tracts," *see R.R. Comm'n of Texas v. Rowan & Nichols Oil Co.*, 310 U.S. 573, 579 (1940), resulting

in the necessary creation of the rule of capture to protect landowners who drilled oil from their properties that migrated naturally from a neighboring property. *Barnes v. Rsrv. Energy Expl.*, 2016-Ohio-4805, ¶ 29, 68 N.E.3d 133, 141 (Ohio Ct. App. 2016 (citing *Nw. Ohio Nat. Gas Co. v. Ullery*, 67 N.E. 494 (1903)). The rule of capture, however, encouraged an inefficient approach to drilling oil and gas by perversely incentivizing landowners to drill their own wells before it was captured by a neighbor, which caused reservoirs to lose pressure, leaving the oil unobtainable. *Paczewski v. Antero Res. Corp.*, 2019-Ohio-2641, ¶ 3, 2019 WL 2722600, at *1 (Ohio Ct. App. June 19, 2019). As discussed *supra*, the doctrines of correlative rights and statutory unitization, or pooling units of land, were adopted to combat the inefficiency, waste, and "first in time, first in right" drilling mindset set by the rule of capture. Bruce M. Kramer & Owen L. Anderson, *The Rule of Capture - An Oil and Gas Perspective*, 35 Envtl. L. 899, 906 (2005).

It is well established that "[i]t is the public policy of the state of Ohio to encourage oil and gas production when the extraction of those resources can be accomplished without undue threat of harm to the health, safety, and welfare of the citizens of Ohio." *Newbury Twp. Bd. of Twp. Trustees v. Lomak Petroleum*, 62 Ohio St.3d 387, 389, 583 N.E.2d 302 (Ohio 1992). The history of pooling unitization in Ohio, demonstrates that the legislature sought to improve the efficiency of oil and gas production in the state, but there is no indication that the state legislature intended to, as a result, exempt from the common law of conversion the extraction of oil and gas from pooled land units. In fact, Ohio recognizes a claim for conversion for minerals that are severed from the land, with no identifiable exception for oil and gas extracted from pooled units. *Chesapeake Exploration, L.L.C.*, 2015-Ohio-4551, ¶ 21–22. To adopt Defendants' approach results in an absurd outcome—foreclosing to landowners the common law remedy of conversion if they cannot prove that the wrongfully converted oil and gas originated from their property with

the science available today—and allow drilling companies to escape liability. This is especially true where the parties have entered into a statutorily sanctioned pooled unitization agreements—a regulatory structure created to improve the efficiency of oil and gas production in Ohio.

The purpose of conversion is to remedy the wrong visited upon the Plaintiff for being deprived of her property, not the wrongful acquisition of the property. *See Ritter, Laber and Assoc., Inc. v. Koch Oil, Inc.*, 2004 ND 117, ¶ 20, 680 N.W.2d 634, 641 (N.D. 2004) (concluding that defendant's wrongful deprivation of plaintiff's excess oil and the proceeds from that oil gave rise to liability under the common law of conversion). Therefore, the circumstances presented here lead to the logical proposition that circumstantial evidence is "entirely reasonable for [the jury]" to consider when evaluating whether Plaintiffs were deprived of their property—an issue the Ohio courts sought to rectify through the creation of the common law doctrine of conversion. *Stratienko v. Cordis Corp.*, 429 F. 3d 592, 600–61 (6th Cir. 2005) (concluding that defendant's use of plaintiff's trade secret could be inferred from evidence of access to the trade secret and similarity of design because misuse of a trade secret could rarely be proved by convincing direct evidence). There is no direct evidence that allows Plaintiffs to prove that the oil extracted from these pooled units originated in the Point Pleasant below the properties they owned. Plaintiffs can demonstrate only that they received royalties from the oil and gas extracted from these pools, which at a minimum implies that Plaintiffs' oil and gas may have been a part of that extraction.

This Court acknowledges that the rule of capture still may be applicable here, but to apply it in the manner put forth by the Defendants requires this Court to assume that Defendants had the authority to drill into the Point Pleasant adjacent to Plaintiffs property. And because there exists a genuine issue of material fact as to whether Defendants acted wrongfully in the first place, the parties' Motions for Summary Judgment on the conversion claim, must fail.

While summary judgment in either party's favor fails on prong two alone, this Court must assess whether Plaintiffs have met the third prong—resulting damages—to establish whether Plaintiffs have adduced sufficient evidence to establish liability for conversion at trial. The general rule for measure of damages in a conversion claim is the value of the property at the time of conversion. *Windward Enterprises, Inc. v. Valley City Dev. Grp. LLC*, 2019-Ohio-3419, ¶ 16, 142 N.E.3d 177, 183 (Ohio Ct. App. 2019). There exists a genuine issue of material fact as to the value of the oil and gas at the time of conversion, especially given the dispute about to whom and how the oil extracted from these pools is sold. Upon settlement of that dispute, the parties' experts can calculate the damages owed during the second phase of trial.

To prevail on a claim of unjust enrichment, a plaintiff must show: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Padula v. Wagner*, 2015-Ohio-2374, ¶ 47, 37 N.E.3d 799, 813 (Ohio Ct. App. 2015) (quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (Ohio 1984)). Unjust enrichment "entitles a party only to restitution of the reasonable value of the benefit conferred." *FedEx Corp. Servs., Inc. v. Heat Surge, LLC*, 2019-Ohio-217, ¶ 12, 131 N.E.3d 397, 401 (Ohio Ct. App. 2019) (citing *St. Vincent Med. Ctr. v. Sader*, 100 Ohio App.3d 379, 384, 654 N.E.2d 144, 147 (Ohio Ct. App. 1995)).

Plaintiffs' unjust enrichment claim is for the "revenues unlawfully received" for the oil and gas sold after extraction from the Point Pleasant. (*Id.*). The first and second elements of a conversion claim are met because Plaintiffs conferred a benefit to Defendants by leasing the subsurface mineral rights and Defendants were aware of this benefit. There remains a genuine dispute of material fact, however, as to whether Defendants have retained that benefit in an unjust

manner. First, because a factfinder must assess whether Defendants acted wrongfully; and second, whether Defendants have improperly calculated royalties based on the parties' agreement.

Lastly, Plaintiffs imply that Defendants' extraction of oil and gas from properties surrounding the properties directly trespassed by a wellbore result in negligence and waste in violation of the correlative rights doctrine; therefore, Plaintiffs allege that the rule of capture does not apply to defendants, and they are converting Plaintiffs' property and being unjustly enriched as a result. This argument, however, fails because Plaintiffs do not provide any evidence that Defendants have acted negligently. While Plaintiffs dispute Defendants' authority to drill into the Point Pleasant, Plaintiffs do not present evidence that these wellbores are in violation of Ohio pooling statute, nor the rule of capture doctrine.

Therefore, this Court finds that there exists a genuine dispute of material fact as it pertains to Plaintiffs' conversion and unjust enrichment claims, but Plaintiffs theory about the application of the rule of capture remains unsupported. As such, this Court **DENIES** summary judgment for Plaintiffs it relates to conversion and unjust enrichment, and **GRANTS in part** summary judgment for the Defendants as it relates to the rule of capture theory as applied to these claims but **DENIES in part** for the remainder of the claim. Additionally, this ruling is applied to Ascent only for the Gold Digger South 3 and 4 and Snodgrass Units, as this Count concludes that Ascent cannot be held liable under a joint theory of liability for the remaining Units.

### E. Count VI: Breach of Contract for Royalties

#### *1. Plaintiffs' Arguments*

In the alternative, Plaintiffs advance a claim of breach of contract for underpayment of royalties against Rice and Gulfport only. (*Id.* at 34; *see also* ECF Nos. 418 at 56–57; 426 at 26–28). The Royalty Payments Clauses of the leases at issue state:

> The Lessee shall pay to Lessor twenty percent (20%) of the gross proceeds received by Lessee from an unaffiliated third party purchaser in an arm[']s length transaction at the point of sale, no less than the prevailing price in the pricing area for materials of like grade and gravity at the time of delivery . . . . Lessor has no responsibility for any costs or expenses in connection with the activities and Operations of Lessee including, but not limited to, drilling, testing, completion, producing or post-production costs, construction, transportation, dehydration, separation, compression, gathering, processing, and marketing; such costs are never to be taken into account when calculating gross proceeds.

(ECF No. 386 at 37). Plaintiffs argue that Defendants are supposed to pay royalties of 20% based on "gross proceeds" for sales to unaffiliated third parties without reduction for costs valued at the point of sale, but instead pay Plaintiffs based on "net proceeds" from sales to affiliated parties valued at the wellhead and are reduced for costs. (ECF No. 386 at 35–39). Plaintiffs explain that this method—the netback method—estimates the third-party sale price in the basin from which the oil and gas was extracted at the time of extraction, resulting in a monthly weighted average of third-party sales price less costs incurred from which the royalties are calculated. (*Id.* at 39). According to Plaintiffs, Defendants calculate the weighted average sales price, or "blended price," by dividing the monthly net sales revenue, reduced for costs, by the sale volume. (*Id.* at 44; 426 at 30–31). Finally, Plaintiffs maintain that if the gross proceeds revenue is less than the prevailing price in the pricing area, the royalties should be based on the prevailing price. (ECF No. 386 at 38). While Defendants acknowledged that they corrected previous calculation errors, Plaintiff maintains that Defendants have yet to correct the deductions. (ECF No. 426 at 32).

Post-2017 and since Rice was acquired by parent company EQT, Plaintiffs allege that Rice pays royalties based on a "sale" to an affiliated company, EQT Energy LLC, reduced by costs related to fuel and at a price based on the lowest regional index price, rather than the higher of the sales or prevailing price—allegedly in violation of the lease. (*Id.* at 35, 42). Plaintiffs argue that the disparity between the price of sales to an affiliated party and an unaffiliated party and difference

between the TETCO M2 price[11] and the prevailing price in the Appalachian area is substantial, resulting in Plaintiffs being underpaid. Plaintiffs argue that Rice should calculate royalties based on the NYMEX gas price index, which Plaintiffs allege Defendants use on their stockholder Securities and Exchange Commission ("SEC") filings and third-party sales. (*Id.* at 42). Plaintiffs allege that Gulfport also fails to pay royalties on the higher of the gross proceeds or prevailing price. (ECF No. 386 at 45). Specifically, Plaintiffs allege that Gulfport bases its calculations on two prices indexes, including the REX Zone 3. (*Id.*). Plaintiffs maintain, however, that a snapshot of Gulfport's royalty payments in October 2019 demonstrate that the royalty check was for less than the REX Zone 3 price, which reflects the Midwest, not Appalachia region. (*Id.*).

Plaintiffs allege that Rice and Gulfport breached their contractual duty to TERA III to pay all severance, excise, or personal property taxes arising out of the lease at the time of the execution of the lease. (*Id.* at 42–44). Instead, Plaintiffs argue that Defendants reduce royalty payments to TERA III by deducting taxes for oil and gas produced from the Skyhawk wells. (*Id.* at 42–44).

According to Plaintiffs, the parties agree to bifurcate issues of liability and damages and further expert testimony is not needed until the damages phase of trial where Defendants will be required to produce third-party sales information without costs. (ECF Nos. 418 at 57; 426 at 29).

### 2. Defendants' Arguments

Defendants allege that Plaintiffs fail to provide any expert testimony to support their position that Defendants miscalculated the royalties. (ECF Nos. 414 at 27–28; 389 at 38; 394 at 6–8). To prove this claim, Defendants argue that Plaintiffs must demonstrate the prevailing price

---

[11] Per the leases, the contract gas price is calculated by using the "Applicable First of the Month Index Price applicable to the interstate pipeline(s) into which the gas is delivered, less prevailing gathering related charges and retainage applicable to such point(s), less any other applicable fees or charges." (ECF No. 386 at 40). The TETCO M2 price is an Appalachia region index price reflected on a third-party published report called Platts Inside FERC. (*Id.* at 41). Plaintiffs argue that the TETCO M2 prices is one of the lowest index prices in the Appalachia region and does not represent the prevailing price in the area. (*Id.* at 42).

of natural gas in the relevant region, which requires an expert opinion on market conditions and value. (ECF No. 3869 at 40). Additionally, they assert that Plaintiffs misrepresent Defendants' actions. First, while Rice admits that it uses the netback method to calculate royalties, it asserts that it reimbursed Plaintiffs for the costs deducted. (ECF Nos. 414 at 20–21). Second, Plaintiffs provide no data to support their assertion that gas sales to affiliated parties was lower than gas sales would have been to unaffiliated parties such that Defendants underpaid royalties. (*Id.* at 22–23). Third, Defendants maintain that TETCO M2 is the prevailing price for Rice's gas, and that the NYMEX gas index price represents the publicly available price of gas at the Henry Hub in Louisiana, over a thousand miles away. (*Id.* 24). Fourth, Defendants argue that they do not reduce Plaintiffs' royalties by a fuel charge, as a fuel charge is a reduction based on volumes that go unsold, and therefore, should not be included in the royalty calculations. (*Id.* at 25). Finally, Defendants allege that Plaintiffs misrepresent the reductions made in Honza's royalty payments because they were a mistake, and Defendants fully refunded Honza. (*Id.* at 26). Because Plaintiffs failed to provide any evidence of expert testimony to support this claim, Defendants assert that they are entitled to summary judgment on this claim.

### *3. Court's Analysis & Findings*

Plaintiffs claim against both Defendants revolves around two main issues: (1) what fuel charge or other postproduction costs allegedly are subtracted from gross proceeds prior to calculating the 20% royalty rate, if any; and (2) the meaning of the "prevailing price in the pricing area." To establish a claim for breach of contract, Plaintiffs must prove: (1) a contract; (2) performance by Plaintiffs; (3) breach by Defendants; and (4) damages caused by the breach. *V&M Star Steel v. Centimark Corp.*, 678 F. 3d 459, 465 (6th Cir. 2012). As this claim relates to Rice, Plaintiffs fail to meet the prima facie evidentiary requirements to survive summary judgment.

Plaintiffs' fails to provide evidence that supports their first theory of breach. Plaintiffs assert that Rice subtracts a fuel charge and other postproduction costs from the overall gross revenue from sales of gas prior to calculating Plaintiff's royalties. Conversely, Rice argues that this deduction does not constitute a fuel charge, but instead represents the gas used to transport the fuel, which is never sold, and all other cost deductions are added back in prior to calculation of Plaintiffs' royalties. The plain reading of the lease language demonstrates that the Plaintiffs are to receive 20% of gross proceeds received by the lessee from a purchase at the "point of sale." (ECF No. 386 at 27). This implies that the oil and gas must be sold for Plaintiffs to receive royalties. Rice explains that it accounts for these lost volumes by subtracting them from either the price or the amount of gas sold, both of which result in the same royalty payments. As it relates to Rice, a review of the exhibits, specifically Mr. Gabbianelli's deposition testimony, demonstrates that despite initially deducting post-production costs from the royalty calculations, Plaintiffs are then credited for those deductions given the contractual requirement that no costs be deducted from the gross sales price (ECF No. 386-37 at 30:2–16)—the opposite of what Plaintiffs allege the deposition demonstrates. Therefore, Plaintiffs cannot rely on this evidence to argue that a breach of contract occurred, when that same evidence disproves their theory.

Plaintiffs' second theory of breach raises questions of contract interpretation because the parties dispute the meaning of "prevailing price in the pricing area." *Shanesville Investments LLC*, 358 F. Supp. 3d at 669–70 (concluding that in Ohio, oil and gas leases are "contract[s] subject to traditional rules of interpretation and construction"). Rice's corporate representative stated in his deposition that Rice relies on gas pricing indexes that are different than the pricing indexes Plaintiffs allege should be considered the prevailing rate. Rice calculates royalties based on the TETCO M2 index because it is the index most regularly used by it and is the most highly used

pipeline. (ECF No. 414 at 23). Plaintiffs counter, however, that it does not represent the prevailing price in the Appalachian region, and instead the prevailing price means the highest price in the region. The parties do not provide any supporting evidence for their assertions why their indices are the prevailing price, and a review of the contract language provides no further context. At most, Plaintiffs offer a snapshot of October 2019 to argue that they are being underpaid on royalties but do not provide any evidence that the indexes reflecting higher sale costs were understood to be the prevailing rate when the contracts were negotiated. Without evidence that Defendants are in fact using the wrong pricing index and breaching the contract, Plaintiffs fail to meet their burden to present prima facie evidence of breach of contract. Therefore, this Court cannot grant summary judgment in their favor. Rice's Motion for Summary Judgment as it pertains to Count VI is **GRANTED**, and Plaintiffs' Motion as it pertains to Rice for this claim is **DENIED**.

As this Claim relates to Gulfport, Plaintiffs' argument about the proper definition of the "prevailing rate" as applied to Gulfport fails for the same reason of absence of any evidence to support their theory. In fact, the common definition of "prevailing" as appropriately applied to this situation is "to be frequent" *Prevailing*, Merriam Wester Dictionary (2023). Further, whether by accident or on purpose, the exhibits of royalty checks Plaintiffs cite to show underpayment were never submitted to this Court. (*See* ECF Nos. 385; 386-48; 386-50; 386-51; 430). Therefore, Plaintiffs' Motion about the proper definition of "prevailing rate" as applied to Gulfport is **DENIED** and Gulfport's Motion addressing the same issue is **GRANTED**.

Plaintiffs' argument that the Gulfport royalties are not being calculated from the gross revenue, but that certain costs are being deducted, however, does survive summary judgment. First, Defendants allege that the deposition testimony Plaintiffs cite for the assertion that Gulfport deducts production costs references Gulfport corporate executives who claim little knowledge of

how the royalties are calculated. (ECF No. 394 at 9 –10 (citing Kristin Atterberry deposition)). That said, Gulfport designated Ms. Atteberry to testify to Gulfport's sale of oil and gas (ECF No. 414-9), and designated Candy Nesom to testify to the calculation of Plaintiffs' royalties. (*See* ECF Nos. 371– 74). A review of the deposition testimony demonstrates that Ms. Nesom's team calculates Plaintiffs' royalties based on the sales figures received from Ms. Atteberry's team. Ms. Atteberry stated in her deposition that the weighted average sales price, which is sent to Plaintiffs, is then reduced for both transportation costs and fuel charges (ECF No. 386-38 at 6, 9). If that is the case, then the royalty calculations completed by Ms. Nesom are calculated from net sales revenue, not gross sales revenue. Plaintiffs also cite to a description of royalty calculations provided to them by Gulfport, which states that royalties are calculated based on gross revenue and no costs are deducted. (ECF No. 386-45). Given the conflicting information, the combination of Ms. Nesom and Ms. Atteberry's deposition testimony, and Gulfport's royalty description, there remains genuine dispute of material fact as to whether Gulfport is incorrectly deducting costs from Plaintiffs' royalty calculations. *Cf. Equal Opportunity Emp. Comm'n v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 389 (E.D.N.Y. 2016) (explaining that deposition testimony can be sufficient to create genuine disputes of material fact for purposes of summary judgment).

Additionally, Defendants argue that Plaintiffs failed to hire an expert to evaluate the market value and conditions of the oil and gas to calculate accurately the royalties and associated damages, which Plaintiffs claim is unnecessary because the case is bifurcated. (ECF Nos. 389 at 40; 414 at 27; 428 at 55). At summary judgment, Plaintiffs need not quantify economic damages to survive, but only must offer evidence of the existence of economic damages. *See Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 602 (6th Cir. 1987) (at summary judgment plaintiffs are only required to produce sufficient evidence "to permit a fact finder to draw reasonable inferences

and [to] make a fair and reasonable assessment of the amount of damages."); *Alternatives Unlimited-Special, Inc. v. Ohio Dep't of Edu.*, No. 12AP-647, 2013 WL 4807016, at *5 (Ohio Ct. App. Sept. 10, 2013) ("Generally, to recover for breach of contract, a plaintiff must prove the existence of economic damages as the result of the breach. Recovery does not require proof of the amount of the economic damages." (internal citations omitted)). Once it is determined what costs, if any, are being deducted from the gross revenue calculations by Gulfport, experts can calculate the difference between the royalties paid and the royalties owed.

Finally, Plaintiffs allege that Defendants are improperly deducting taxes and fees from Honza's royalty checks. (ECF No. 414 at 26). While Plaintiffs allege that Gulfport failed to rectify the alleged deductions taken from TERA III's royalty payments, the exhibits they cite for the proposition were never submitted to this Court (ECF Nos. 386-47; 386-50; 386-51).[12] Therefore, Gulfport's Motion is **GRANTED** as it relates to the TERA III royalty check deduction arguments, and Plaintiffs' Motion is **DENIED** for the same argument.

Therefore, the only portion of Plaintiffs' Motion for Summary Judgment for Breach of Contract that survives summary judgment is its claim against Gulfport related to the deduction of costs prior to calculating royalties. Hence, the cross Motions on this limited issue are **DENIED**.

### F. Count V: Fees

Plaintiffs do not seek summary judgment as to Count V related to fees. (ECF No. 386 at 1, n. 1). They state, however, that the leases contain an "indemnity agreement" which requires the lessee "to indemnify the Plaintiff for any expenses incurred as a result of lessee's actions." (ECF No. 302, ¶ 146). This provision, they argue applies to even those leases which have been

---

[12] The exhibit cited by Plaintiffs to support this assertion was a filler pending the Magistrate Judge's approval of a Motion to Seal. (ECF No. 385). The Motion to Seal was granted on April 14, 2022. (ECF No. 430). Whether by mistake or done intentionally, a review of the docket demonstrates that Plaintiffs never filed the exhibits after the motion was granted. (ECF No. 386, Exh. BN).

terminated, because of an express provision that states that indemnity will "survive termination of this Lease." (ECF No. 418 at 59). According to Plaintiffs, this includes expenses, court costs, attorneys' fees, expert fees, and audit costs. (ECF No. 302, ¶ 147). Defendants counter that they are not responsible for Plaintiffs' legal fees because Plaintiffs must fail on their other legal claims and a claim for fees turns on a finding of wrongdoing. (ECF No. 389 at 41–42). Absent a finding of breach at this stage, however, this claim must survive summary judgment and be assessed by the factfinder. Therefore, Defendants' Motion for Summary Judgment as it relates to fees is **DENIED**.

### G. Defendants' Affirmative Defenses

Defendants advance many affirmative defenses (ECF Nos. 321; 322; 323), and Plaintiffs seek summary judgment in their favor for the following: (1) laches and unclean hands; (2) estoppel and quasi-estoppel; (3) consent; (4) ratification; (5) waiver; and (6) accord and satisfaction. (ECF No. 386 at 46–52).

### 1.  Laches and Unclean Hands

Plaintiffs argue that the defenses of laches and unclean hands have no merit. (ECF No. 386 at 46). First, Plaintiffs argue that a delay in asserting a right under Ohio law does not constitute laches on its own, but that Defendants must show that they have been materially prejudiced by Plaintiffs' delay. (*Id.* at 48 (citing 3-6 Williams & Meyers, Oil and Gas Law, § 604.7(2014)). Second, Plaintiffs argue that they do not have unclean hands, because they acted diligently[13] in

---

[13] Specifically, Plaintiffs detail that they became aware of Defendants drilling into the Point Pleasant in 2017 and 2019. (ECF No. 386 at 49 n. 71). To verify that the Point Pleasant was a separate geological formation, Plaintiffs met with representatives of the ODNR. (*Id.*). Subsequently, Plaintiff Thomas Shaw filed a related lawsuit on behalf of TERA, LLC in the Belmont County Court of Common Pleas, where the Court found in favor of Plaintiff on declaratory judgment and trespass. (*Id.*).

bringing this litigation and the doctrine only applies to reprehensible, grossly inequitable, or unconscionable conduct—a high burden Plaintiffs claim Defendants fail to meet. (*Id.*; 418 at 53).

Conversely, Defendants argue that Plaintiffs admit in their Motion for Summary Judgment that the applicability of laches and unclean hands are questions of fact reserved for the factfinder. (ECF No. 414 at 29). Defendants argue that Plaintiffs were aware where Defendants were planning to drill, and Plaintiffs unreasonably delayed, without excuse, bringing this action. (*Id.*). Specifically, Ascent argues that Plaintiffs provide no evidence that they sought to cease Ascent's operations before it developed the Ross or Coleman Units; therefore, the laches defense applies. (ECF No. 415 at 47).

To successfully invoke the doctrine of laches, the party invoking it must establish by a preponderance of the evidence: (1) unreasonable delay or lapse of time in asserting a right; (2) absence of an excuse for the delay; (3) knowledge, actual or constructive, of the injury or wrong; and (4) prejudice to the other party. *Meyer v. Bank of Am., N.A.*, No. 2:18-cv-218, 2021 WL 868587, at *19 (S.D. Ohio Mar. 9, 2021) (citing *State ex rel. Meyers v. Columbus*, 71 Ohio St. 3d 603, 646 N.E.2d 173, 174 (Ohio 1995). Mere delay in asserting the right does not establish laches, but rather material prejudice that resulted from the delay. *Id.* (citing *Connin v. Bailey*, 15 Ohio St. 3d 34, 472 N.E.2d 328, 329 (Ohio 1984)). "What constitutes material prejudice is primarily a question of fact to be resolved through a consideration of the special circumstances of each case." *State ex rel. Doran v. Preble Cty. Bd. of Comm'rs*, 2013-Ohio-3579 ¶ 30, 995 N.E.2d 239, 246 (Ohio Ct. App. 2013) (internal citations omitted). This includes: (1) the loss of evidence helpful to the case; or (2) a change in position which would not have occurred if the right had been promptly asserted. *Toki v. Toki*, 2020-Ohio-130 ¶ 14, 2020 WL 261246, at *3 (Ohio Ct. App. Jan. 15, 2020).

Ohio courts have rarely applied laches to lawsuits, usually on the basis that there was not sufficient material prejudice, no matter the amount of time that had passed. For example, in *Connin*, the plaintiff waited thirty-five years after a court order of child support to seek the payments against the defendant's estate after his death. *Connin*, 472 N.E.2d at 329. The court excused the delay because enforcing the child support required taking time off work and finding someone to watch plaintiff's son. *Id.* at 330. The court found no material prejudice because of the delay and overruled the defense of laches. *Id.* An Ohio court did apply laches, however, in *Preble Cty. Bd. Of Comm'rs* following a twenty-seven-month delay in the construction of a sewer project. *Preble Cty. Bd. of Comm'rs*, 995 N.E.2d at 242. The court found that changing the plans for the sewer project when it was almost completed would cost taxpayers too much money and require too large a charge in the plans, resulting in material prejudice. *Id.*

Defendants contend that they would not have invested the money into drilling new wells if they knew that Plaintiffs would file suit two years after Defendants claim Plaintiffs became aware of the drilling into the Point Pleasant. (ECF No. 407 at 25). According to Defendants, this drilling and continued production created material prejudice in the amount of money Defendants spent and will now lose. Plaintiffs retort that Defendants continue to extract and even drilled new wells after suit was filed and a $40.1 million judgment was entered against Defendants for willful trespass in state court. (ECF Nos. 386 at 49; 426 at 33). Loss of funds may amount to material prejudice if it can be reasonably proven. *See State ex rel. Mallory v. Pub. Emples. Ret. Bd.*, 1998-Ohio-380, 694 N.E.2d 1356, 1364 (Ohio 1998). Here, if Defendants can prove that the amount of money spent to continue extraction and drill new holes would not have been spent had the lawsuit been initiated earlier by Plaintiffs, then the money spent may amount to loss of funds and material prejudice against Defendants sufficient to require dismissal under the defense of laches. Yet, Defendants

continued to extract oil and gas from these properties, profited from the sale of those minerals, and paid Plaintiffs royalties from the proceeds. Therefore, there remains a genuine dispute of material fact as to whether Defendants were prejudiced.

The unclean hands doctrine "requires that whenever a party takes the initiative to set in motion the judicial machinery to obtain some remedy but has violated good faith by his prior-related conduct, the court will deny the remedy." *Marinaro v. Major Indoor Soccer League*, 81 Ohio App. 3d 42, 44–45, 610 N.E.2d 450, 452 (Ohio Ct. App. 1991). That conduct must relate to the subject matter of the suit. *Id.* In *Marinaro*, Plaintiff had accepted a bribe to throw games while playing in Singapore for the Canadian National Soccer Team. *Id.* at 451. After litigation in Canada and a one-year suspension by FIFA, the Major Indoor Soccer League (MISL) also suspended Marinaro for one year. *Id.* Marinaro sought and received an injunction preventing the suspension from going into effect in the MISL because the proper procedure for suspension was not followed. *Id.* The Court of Appeals found in favor of defendants under the unclean hands defense, however, because Marinaro had acted wrongfully when he accepted bribes in Singapore, which ultimately led to his suspension, and Marinaro could therefore not bring suit subsequently. *Id.* Similarly, in *Crick v. Star*, 2009-Ohio-6754 ¶¶ 16–18, 2009 WL 4895270 at *1 (Ohio Ct. App. Nov. 9, 2009), an ex-husband fraudulently transferred two boats to his ex-wife so that he would not have to pay taxes on them. *Id.* at 1. When the Ohio Department of Taxation required him to pay taxes on the boat, he sued his ex-wife for repayment from under their separation agreement. *Id.* at 2. The Seventh District found the fraud reprehensible conduct and ordered that he pay taxes himself and not receive reimbursement. *Id.* at 8.

Here, Defendants paint a story of Plaintiffs knowing the Point Pleasant is included in the Utica Shale, and that they took advantage of a contractual ambiguity to bring these claims. (ECF

No. 414 at 32). Defendants also assert that the Plaintiffs were using this as a test case to see how the claims would fare in court. (ECF No. 415 at 48). Assuming the worst that Plaintiffs are attempting to defraud the Defendants with this lawsuit with *knowledge* that the contracts did permit drilling into Point Pleasant, then Defendants would have the defense of unclean hands to use against Plaintiffs. It is possible, however, the Plaintiffs demonstrate that Defendants themselves were not acting in good faith in drilling into the Point Pleasant with *knowledge* that the contract did not permit them to do so. Because both defenses require a fact-intensive inquiry and a finding that Defendants acted wrongfully in the first place, this Court **DENIES** Plaintiffs' Motion for Summary Judgment as to the defenses of laches and unclean hands.

### 2. *Estoppel and Quasi-Estoppel*

Plaintiffs claim that the only argument supporting these defenses is Plaintiffs' acceptance of royalty payments from Defendants. (ECF No. 386 at 52). Plaintiffs argue, however, that Ohio courts have rejected this argument by concluding that landowners are entitled to royalty payment regardless of whether a lease is valid or not. (*Id.*). Further, Plaintiffs assert that Defendants have not suffered material prejudice because they did not lose any revenue, nor did they halt any plans to continue drilling wells once this litigation was filed. (ECF Nos. 418 at 54; 426 at 33–34).

Defendants argue from the time the leases were signed, they incurred significant expenses to drill and produce oil and gas, while Plaintiffs profited from the conduct they now attack. (ECF No. 414 at 32). Further, Defendants asserts that Plaintiffs waited two years after finding out the Point Pleasant was a separate geological structure to file the above-captioned lawsuit. (ECF No. 415 at 48). As such, Plaintiffs are not entitled to summary judgment on the defense of estoppel because the Ohio courts require a fact-intensive inquiry and an assessment of whether Plaintiffs

would otherwise be entitled to the royalty payments they received and whether acceptance is consistent with their arguments. (ECF No. 415 at 49).

"Equitable estoppel prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment." *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn.*, 71 Ohio St.3d 26, 34, 641 N.E.2d 188, 196 (1994). To invoke the doctrine of equitable estoppel, a party must demonstrate: (1) "representation by words, acts, or silence; (2) the representation must communicate some fact or state of affairs in a misleading way; (3) the representation must induce actual reliance by the other party, and such reliance must be reasonable and in good faith; and (4) the other party would suffer prejudice if the representing party were not estopped or precluded from contradicting the earlier representation." *Victor v. Big Sky Energy, Inc.*, 2018-Ohio-4666, ¶ 58, 124 N.E.3d 283, 294 (Ohio App. Ct. 2018). Relatedly, waiver by estoppel "exists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it." *Thermo Credit, LLC v. DCA Services, Inc.*, 755 Fed. App'x 450, 457 (6th Cir. 2018) (quoting *Mark-It Place Foods, Inc. v. New Plan Excel Realty Tr., Inc.*, 2004-Ohio-411, 804 N.E.2d 979, 1000 (Ohio Ct. App. 2004)). This inquiry "turns on the facts of each case and whether the acceptance of the benefit is inconsistent with the landowner's legal position concerning the lease." *Sims v. Anderson*, 2015-Ohio-2727, 38 N.E.3d 1123, 1132 (Ohio Ct. App. 2015).

Estoppel and waiver by estoppel do not always apply where a landowner has the right to payment, because whether the lease or conduct was valid, accepting a payment is not inconsistent with a legal position challenging the transaction. *Id.*; *Bonner Farms, Ltd. v. Fritz*, 355 Fed. App'x 10, 16 (6th Cir. 2009) (holding acceptance of royalty payments despite suit to terminate lease for

failure to continue production was not an inconsistent legal position); *Harding v. Viking Int'l. Res. Co., Inc.,* 2013-Ohio-5236, 1 N.E.3d 872 (Ohio Ct. App. 2013) (while there are cases that stand for the proposition that acceptance of royalty payments may result in a landowner being estopped from asserting a breach, there are just as many that hold that the acceptance of a benefit such as royalty payments does not result in the landowner being estopped). Again, these defenses require a highly fact intensive inquiry that must be reserved for trial. Therefore, this Court **DENIES** Plaintiffs' Motion for Summary Judgment as it pertains to estoppel and quasi-estoppel.

### 3. *Consent, Ratification, and Accord and Satisfaction*

Defendants maintain throughout their briefing that summary judgment in favor of Plaintiffs on all these defenses must fail because the Plaintiffs behaved as if the leases provided to Defendants the right to drill. (ECF No. 414 at 31). Defendants allege that Plaintiffs only entered the leases to receive a higher percentage of royalties and avoid unitization, but that at the time of negotiation Defendants were clear that they intended to drill into the Point Pleasant. (*Id.* at 31–32). Defendants also allege that Plaintiffs admit that waiver is a question of fact, resulting in a genuine dispute of material fact. (ECF No. 414 at 29).

Although listed in the section heading addressing affirmative defenses, Plaintiffs never actually address Defendants' defense of consent. Therefore, this Court **DENIES** Plaintiffs' Motion for summary judgment as it pertains to the defense of consent.

Similarly, the information provided to this Court as to the application of ratification as defenses is limited. Ratification typically appears in litigation where issues of agency arise, and actions not initially authorized but later ratified by the principal occur. In the case cited by Plaintiffs, *Uhlenbrock v. KeyBank*, No. 00AP-721, 2001 WL 50465 (Ohio Ct. App. Jan. 23, 2001), the court found that the affirmative defense of ratification applied because the plaintiff had ratified

the checks at issue in the contract itself and KeyBank, the defendant, had acted properly in distributing those checks. While this Court can make assumptions about how Defendants intend to argue this defense, without more, this Court cannot make an educated assessment of the application of the defense at summary judgment.

If a party "against whom a claim for damages is made can prove accord and satisfaction, that party's debt is discharged by operation of law." *Allen v. R.G. Indus. Supply*, 1993-Ohio-43, 611 N.E.2d 794, 797. "When an accord and satisfaction is pled by the defendant, the court's analysis must be divided into three distinct inquiries. First, the defendant must show that the parties went through a process of offer and acceptance—an accord. Second, the accord must have been carried out—a satisfaction. Third, if there was an accord and satisfaction, it must have been supported by consideration." *Bd. of Educ. v. Am. Energy Utica, LLC*, 2020-Ohio-586, 152 N.E.3d 378, 398 (Ohio Ct. App.) (citing *Allen*, 611 N.E.2d at 797).

This Court is uncertain what argument Defendants attempt to make with this defense. Accord and satisfaction typically arises when there is a dispute over the amount of money owed and is the result of a settlement. *See Maine v. Leonard Truck & Trailer, Inc.*, 2014-Ohio-5722, 2014 WL 7358058, at *6 (Ohio Ct. App. 2014) (addressing dispute over the amount owed for a boat trailer repair after the boat had been damaged on the repairman's property because there was an issue of material fact whether the acceptance of the check by the repairman was meant to constitute acceptance of lesser payment). At best, this Court gleans that accord and satisfaction is meant to function akin to waiver and estoppel because Plaintiffs accepted the royalty checks. There is nothing, however, to suggest that anything beyond the acceptance of the checks has occurred. There were no negotiations, outside of these briefings, about how much the Plaintiffs were really owed in the dispute and the royalty payments were not meant to satisfy any agreement beyond the

original contract. There is also nothing to suggest that Plaintiffs accepted the checks in lieu of continuing this lawsuit.

Since these defenses cannot be foreclosed at this stage because there exists a genuine issue of material fact as to whether the defense even need to be applied, summary judgment for Plaintiffs as to the defenses of consent, ratification, and accord and satisfaction is **DENIED**.

## IV.    CONCLUSION

For the reasons stated above, former Defendants XTO Energy, Inc. and Phillips Exploration LLC's Motion for Summary Judgment (ECF No. 392) is **DENIED AS MOOT**. This Court also rules as follows on the parties' cross Motions for Summary Judgment (ECF Nos. 145, 386, 387, 388, 389, 393, 394, 477):

- **Threshold Matters:**
  - Plaintiffs' First Motion for Partial Summary Judgment is **NOT** moot; Defendants' Motion is **DENIED**.
  - Plaintiffs' Motion to use offensive non-mutual collateral estoppel is **DENIED**.
  - Defendant Ascent Resources – Utica, LLC's ("Ascent") Motion on application of Joint Venture Theory of Liability:
    - **GRANTED** for Ascent, **DENIED** for Plaintiffs: Gold Digger, Son-Uva, Big Foot 7, Dorsey East, Skyhawk 3 Units.
    - **DENIED** for Ascent, **GRANTED** for Plaintiffs: Gold Digger South 3 and South 4 Units.
    - **DENIED** for both Ascent and Plaintiffs: Snodgrass Unit.
    - Potential period of liability under Joint Venture Theory: **DENIED** for both parties.
  - Defendant Gulfport Energy Corporation and Gulfport Appalachia, LLC's (together "Gulfport") Motion for Summary Judgment for all damages prior to May 17, 2021 is **GRANTED**.
- **COUNT I –** Declaratory Judgment: **DENIED** for all parties.
- **COUNT II –** Trespass: **GRANTED in part, DENIED in part** for Defendants; **DENIED** for Plaintiffs.
- **COUNTS III & IV –** Conversion & Unjust Enrichment: **DENIED** for Plaintiffs; **GRANTED in part** for Defendants as related to application of the rule of capture and **DENIED in part** for remainder of argument for Defendants.
- **COUNT V –** Fees: Defendant's Motion for Summary Judgment is **DENIED**.

- **COUNT VI –** Breach of Contract: Plaintiffs' Motion is **DENIED**; Defendants Rice Drilling D, LLC's ("Rice") Motion is **GRANTED**; Defendant Gulfport's Motion is **GRANTED in part** and **DENIED in part**.
- **Affirmative defenses:** Plaintiffs' Motion is **DENIED** as to all affirmative defenses.

      **IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: June 28, 2023**